SOLMSON *v.* DEESE.

Opinion delivered February 9, 1920.

1.   BROKERS—LIABILITY TO PRINCIPAL.—Where a broker undertook to
     sell the principal's land for $50,000, under a contract which
     authorized a sale for $50,000, with a commission of $1,000 if a
     sale was made at that price, together with any excess over $49,000
     net to the principal, and subsequently took a deed from his prin-
     cipal for $49,000, but paid the principal, $45,000, explaining that
     the purchaser would pay that amount only, when in fact he had
     sold the land for more than $50,000, he will be responsible to
     his principal for the difference between $49,000 and $45,000.

2.   BROKERS—RATIFICATION OF TRANSACTION.—Where the owner of
     land sold to the State through an agent accepted a payment from
     the agent as in full settlement of all issues between them, with-

out knowing the terms of the sale, he will not be held to have
ratified a transaction whereby the agent retained a much larger
commission than the owner had agreed to give him.

3. BROKERS—MISREPRESENTATION AS TO ACREAGE—LIABILITY.—Where
an owner of land employed an agent to sell for a net price, the
broker to receive the excess over that price, and made no repre-
sentations as to acreage, but the agent sold under a false repre-
sentation as to the number of acres, it was proper to deduct the
proportionate amount of the shortage from the agent's commis-
sion.

4. BROKERS—LIABILITY FOR SHORTAGE.—A broker who without au-
thority makes false representations as to the number of acres
in the land sold by him will be bound thereby, whether he made
the representations innocently or not.

5. VENDOR AND PURCHASER — DEDUCTION FOR SHORTAGE.—Where a ,
deed represented the land sold as being "304.26 acres, more or
less," and a survey proved that there was a shortage of 66 acres,
such shortage was so large a proportionate part of the whole
as to constitute a gross mistake, entitling the buyer to deduc-
tion therefor.

6. VENDOR AND PURCHASER—ACREAGE IN SANDBAR.—Where a sand-
bar was not considered in making a sale, except as a thing con-
veyed in adldition to the property for which value was paid,
acreage in the sandbar need not be taken into account in de-
termining the deduction to which the purchaser is entitled on
account of a shortage in acreage.

Appeal from Pulaski Chancery Court; *John E. Mar-
tineau*, Chancellor; affirmed.

*Cohn, Clayton & Cohn* and *Moore, Smith, Moore &
Trieber*, for appellant.

1. The relation between Solmson and Deese had
changed from that of principal and agent to that of ven-
dor and vendee at the time the purchase contract was
entered into on March 23, 1919. The testimony of the
members of the Board of Control reveals the true facts
as to the purchase of the farm as they occurred and they
had undertaken the performance of the obligation placed
upon them by the Legislature. The contract actually
entered into is the best evidence of what the parties
agreed to. There is no other testimony than that of
Deese himself that Solmson claimed to be buying for

another party. All the circumstances of the trade and all that followed are strongly opposed to the contention of Deese. If Solmson was selling to another party for the account of Deese and did not disclose to whom the sale was being made until after Deese executed the deed to him and then disclosed it by a statement that he was "unloading" the property on this party, that is, the State, this would naturally immediately arouse the suspicion of Deese as to the price at which he was selling to the State, because the word "unload" would convey to the mind of even an ignorant person that it was done in an unconscionable way, for an excessive consideration. The greater weight of the evidence supports the contention that Solmson from the beginning negotiated with Deese for the purchase of the place and in taking the agency contract considered it as the equivalent of an option to purchase. The payment of the additional sum was consistent with his position as a purchaser, and inconsistent with Deese's contention that he continued as Deese's agent. All the facts and circumstances show that when Solmson entered into the second contract with Deese on March 23 he had had no prior negotiations with the Board of Control or any one for them, and that there was nothing for him to diclose to Deese except that he personally desired to purchase the place and would pay the price offered. No other finding can be made except by wholly disregarding the evidence of the members of the Board of Control, whose statements have the stamp of truth and frankness.

2. The evidence shows ratification by all parties of the sale of the place to Solmson. Notice of the facts and circumstances would put a man of ordinary intelligence and prudence on inquiry, and this is equivalent to knowledge of all the facts that reasonably diligent inquiry would disclose. 58 Ark. 91; 104 N. W. 820; 2 Pom. Eq. Jur., sec. 959. See also 31 N. W. 52; 40 Fed. 777.

3. There was a shortage in acreage, but a mistake of Deese as to his acreage was not the fault of Solmson.

If Deese elects to take the benefit of the relation of agency, he must assume the burdens incident to it. If the State can not recover, then it would be unconscionable to permit Solmson to recover from Deese. The board bought the place *en masse* without regard to the acreage, and the board is presumed to have had knowledge. If the actual shortage is too large to be embraced under the "more or less" clause, the abatement should be made for not exceeding 52 acres instead of 66 acres. 18 S. E. 355; 12 *Id.* 389; 54 Ind. 374; 29 Md. 305; 41 N. E. 599; 213 S. W. 201.

Assuming that Solmson told the Board of Control that he would make good the shortage, the promise, if made, related to a past and completed transaction, and there was no new consideration therefor, and no liability. 26 Ark. 160; 2 *Id.* 160; 66 *Id.* 26; 68 *Id.* 276; 70 *Id.* 232; 112 *Id.* 227; 37 L. R. A. (N. S.) 930; 73 S. E. 56; 70 W. Va. 38; 9 Cyc. 356; 30 S. E. 364; 51 *Id.* 603; 102 Am. St. 779; 76 S. W. 821. The decree should be reversed with directions to dismiss the complaint, the cross-bill of Solmson and the intervention of the Board of Control; or, in the alternative, that Solmson be given judgment against Deese and the judgment in favor of the Board of Control be credited on the $15,000 note executed by Solmson to Deese to the extent of the judgment recovered by Solmson against Deese and the balance of the judgment in favor of the State be credited on the note of the board to Solmson first maturing.

*John F. Clifford,* for appellee Deese.

1. It is conceded that the first contract was one of agency, and that the court was correct in its conclusion that the status of principal and agent, once fixed, could not be changed by Solmson into that of vendor and purchaser without full and complete disclosure to Deese of all the facts which Solmson knew at the time. The burden of proving this full, complete and honest disclosure was upon Solmson, and there is no testimony that he disclosed anything to Deese. The testimony of Deese is

clear and convincing that he did not know who the purchaser was and did not know the price Solmson received for the land until some days thereafter. In transactions between principals and agent *uberrima fides* is required, and if not the transaction is voidable and will be set aside at the option of the principal. 73 Ark. 575; Pom. Eq. Jur. (4 Ed.), par. 951.

2. Where the evidence is conflicting in chancery cases, the finding of the chancellor will not be reversed unless clearly against the preponderance of the testimony. 101 Ark. 503; 85 *Id.* 105; 101 *Id.* 522.

3. The contract executed on Sunday was void and of no effect either as a contract or evidence of change of status of the parties. An agent can not, without the clear consent of his principal, suddenly change the relationship and buy for himself at a reduced figure. The decree of the chancellor is sustained by the evidence as to Solmson's acts and statements, and that he did not make a full statement of what he knew, and the finding of the chancellor is conclusive.

4. Discrepancies in testimony are natural and usual, but the great preponderance of the testimony is in favor of Deese's contention and against Solmson. The doctrine of ratification does not affect the issues here between Deese and Solmson, but there was in fact no ratification of Solmson's acts, and the chancellor in effct so found. The chancellor properly held that the $250 payment was not in accord and satisfaction of Deese's claim. As to the shortage in acreage Deese stated clearly and definitely that he did not know the acreage—had never had it measured or surveyed. The relationship of principal and agent existed from the date of the signing of the contract upon March 19 until April 2, when the place was delivered to the Board of Control. The paper signed on Sunday was a nullity because of fraudulent representations and because also it was altered. There was no accord and satisfaction and the decree should be affirmed.

*John D. Arbuckle,* Attorney General, and *Robert C. Knox,* Assistant, for appellee Board of Control.

The board knew no one in this transaction except Solmson, and if he acted as agent for Deese but held himself out as the true owner and did not disclose his principal, he becomes personally liable for any misrepresentations and false warranties he may have made. So far as these interveners are concerned it is unnecessary to discuss the liability of Deese, as we did not deal with him in any way and were not apprised of the fact that they were dealing with his agent. All our late cases on this subject are bottomed upon 19 Ark. 103. See 25 Ark. 541; 30 *Id.* 535; 61 *Id.* 120; 71 *Id.* 97. The deficiency here is 21.7 per cent. For decisions of other courts on the questions involved, see 11 S. E. 218; 79 S. W. 185; 51 S. E. 827; 122 S. W. 220; 5 N. E. 375; 4 Ind. 512; 152 Mass. 60; 170 Mo. 121; 4 N. J. Eq. 212; 25 N. Y. 224; 29 A. & Eng. Enc. Law 629.

After appellant was advised of the shortage he agreed to hold the State harmless and that he would be liable for any shortage in acreage. There was a new consideration for his agreement. The decree below is right and should be affirmed.

SMITH, J. J. R. Deese brought this suit, and for his cause of action alleged that he had employed H. B. Solmson as his agent to sell his farm, and that the contract of agency authorized a sale for $50,000, with a commission of a thousand dollars, if a sale was made at that price, together with any excess over $49,000 net to Deese, but that his said agent had made a sale at $62,500 and had only accounted to him for $45,000, and judgment was prayed for $16,500.

Solmson filed an answer denying the allegations of the complaint, and alleged the facts to be that, acting solely for himself, he took a contract from Deese for a period of thirty days for the sale of the farm together with certain personal property for the net sum of $49,000, Solmson to receive all in excess of that sum as compen-

sation. That, while said contract was in the form of an agency contract, Solmson in fact intended to obtain an option for the purchase of said property, and in pursuance of this purpose he, in a few days after obtaining said contract, entered into negotiations with Deese to purchase said property for himself, and on March 29, 1919, Deese and his wife conveyed said property to him for the consideration of $46,950.

It very clearly appears that Solmson is a man of much more experience in the transaction of important business than is Deese; in fact, Solmson is a man of large and successful experience, yet the original contract entered into between the parties is very clearly an agency contract, a form being used in its preparation which was in common use by real estate agents in Little Rock in taking contracts to sell land. Solmson admits that he knows, and knew, the difference between an agency contract and a contract with an option to buy, and that he knew the contract he had taken was an agency, and not an option, contract; but he says it was his purpose to take an option contract, and that this purpose was effectuated by the second contract, which he made with Deese. The first contract was executed March 19, 1919, and the second one on March 24, 1919.

This second contract is in form a contract of sale and recites a consideration of $49,000, of which sum $5,000 is cash in hand paid, and Solmson says this second contract expresses the agreement he had with Deese. This is denied by Deese. In fact, according to Deese's testimony, and that of his son, who was present when the contract was signed by Deese and wife, the contract which they did sign was written on a single page, while the writing produced appears on three different pages, the insistence being that the writing is now a contract of sale when it was not so at the time of its execution. We do not review the testimony on this disputed point and decide that dispute, as we find it unnecessary to do so. On March 29 Deese and his wife executed and delivered to Solmson a deed to the land, and a separate bill of sale for

the personal property, for the consideration recited in the contract of sale. Deese testified that when the deed and bill of sale had been delivered Solmson confided to him that he had "unloaded" this property on the State Board of Control, but did not tell him the terms of the sale, and he was not advised as to its terms until a few days before the institution of this suit, and that as soon as he was advised he immediately consulted his attorney and brought this suit, it being filed April 25, 1919.

The General Assembly, at its 1919 session, passed an act, which was approved February 13, 1919, directing the Board of Control of the State Charitable Institutions to purchase and operate a farm within fifteen miles of the city of Little Rock, and pursuant thereto the members of the board undertook to locate a farm containing something like 500 acres, and that fact appears to have been generally known to the real estate men of the city, although the testimony does not show when Deese was first advised of the board's purpose. The board was unable to find a place of that size and decided to buy a smaller place, and, being advised that Solmson had lately become the owner of the land in controversy, they sent for him and opened the negotiations which terminated in its purchase. The board members testified that they dealt with Solmson as the owner, and knew no other party in the transaction, and that on April 2 he executed a deed to them for the land, which, after describing the lands, contained the further statement, "all of the foregoing lands being in township 1 north, range 11 west, and containing three hundred four and twenty-six hundredths (304.26) acres, more or less, also all accretions thereto, whatever they may be or become."

In addition to this recital, the board members testified that Solmson represented to them that the place contained 304.26 acres of tillable land and a sandbar of fifteen to twenty acres, and this Solmson admits doing. After obtaining the deed the board caused a survey of the land to be made, which disclosed the fact to be that there were only 254.12 acres of tillable land and fourteen

acres in the sandbar, which is practically valueless. The correctness of this survey is not disputed. Thereupon the Board of Control intervened in this litigation and asked a proportionate abatement of the purchase money.

It is insisted on behalf of Solmson that, even though his original contract with Deese created an agency, his second contract changed the relationship to that of vendor and vendee, and the correctness of this contention presents the real question in the case. Upon this issue we summarize our understanding of the facts as follows: Solmson had an agency contract, which gave him as his commission the excess over $49,000, but at the time of making the second contract he represented to Deese that his "party" would only pay $45,000, yet the cash payment recited, together with the deferred payments, aggregated $49,000. A cash payment of $5,000 was recited, of which only a thousand dollars was in fact paid. The $4,000 additional cash consideration was paid by Solmson delivering to Deese his check on the American National Bank for $4,000, payable to Deese, which Deese endorsed and returned to Solmson, who later passed the check through the bank, having the same marked paid by it. Solmson did not tell Deese he expected to sell the property to the State. Upon the contrary, he asserts the fact to be that he did not open negotiations with the board until after he had completed his purchase. A witness named Thomason gave testimony, however, to the effect that he had a conversation with Spencer, the partner of Solmson, in which Spencer stated that Solmson had a purchaser for a farm such as the Board of Control desired to buy, the substance of that testimony being that Solmson had the customer if he could get the farm. This conversation is said to have occurred at a time when, if the facts there stated were true, there was a gross breach of good faith to Deese on Solmson's part. Spencer denied having this conversation, and the chancellor made no finding of fact on that issue, stating in the opinion, which he delivered in deciding the case, that he considered it unnecessary to do so.

Deese testified that the second contract was executed on a Sunday morning and dated a day later; that Solmson stated $45,000 was the best price he could get out of his party, but that the purchaser would need a manager, and that he would endeavor to secure that position for him, and that, without being told that Solmson was assuming the attitude of purchaser, and without reading the contract, he and his wife signed it under the assumption that it was a writing authoizing Solmson to make a sale at the price which Solmson had then and there said was the best one obtainable.

As has been said, the testimony is irreconcilably in conflict on this question of fact; but Solmson admits that he never told Deese about the details of his trade with the Board of Control, and did not do so even when the deed was executed and delivered, as he stated that he thought it was none of Deese's business.

In reviewing this testimony and in pronouncing judgment thereon the court below found the facts as follows:

"If Solmson entered into a contract of agency, then there is nothing in the record which will show that that contract was changed until the sale of the land. If he entered into a contract of purchase, that contract continued until the final sale of the land to him by Deese. There is no doubt but that at the time the contract was finally consummated Deese understood that he was making a sale of the land to Solmson, or, rather, in Solmson's name. * * * But I have reached the conclusion that at the time they entered into the contract it was a contract of agency."

In holding that it was unnecessary to pass upon the question of veracity between Thomason and Spencer the court made this declaration of law upon the finding of fact above stated:

"If it is true that when they (Solmson and Deese) commenced their negotiations they created a contract of agency, and not one of sale, then Solmson by no act of his which was not fully explained to Deese could have changed that contract. When he found a purchaser for

the land it was his duty to make correct representation to Deese, as to the price he was to receive for it. If he did not do that, and sold it for more than he represented, then he is responsible to Deese for the sum at which he did sell it."

We think the finding of fact is not clearly against the preponderance of the evidence, and the law as declared conforms to Professor Pomeroy's statement of the agent's duty to his principal (Pomeroy's Equity Jurisprudence (4 Ed.), § 959), and both are, therefore, approved. See also *Thweatt* v. *Freeman*, 73 Ark. 575.

It is further insisted in Solmson's behalf that Deese, for the full consideration of the sum of $250, ratified the sale to Solmson. The court below, however, made an express finding against that contention; and we think the court was warranted in doing so. At the time this check was given a dispute had arisen between Solmson and Deese over the current accounts of the tenants on the place due to Deese and which he estimated at $500. At the time this payment was made Solmson called the board members, who were then present for the purpose of checking in and receiving the personal property, to witness the fact that he was paying Deese $250 in full settlement of all issues between them growing out of the sale of the farm. But it is undisputed that even then Deese did not know the terms upon which the sale had been made; consequently Deese did not ratify a transaction of which he was ignorant.

The total consideration paid and agreed to be paid by the State was $62,235. Deducting the value of the personal property the court found that the purchase price of the land, computed upon the correct acreage, was $147.90 per acre, and ordered an abatement of the purchase price which remained unpaid by the State for the shortage in acreage at the price per acre paid for the land. It is insisted that if the State is given credit for this deficiency, Solmson should also be given credit for it on his note to Deese. But we do not agree with that contention. Deese made no misrepresentation about the

acreage, and the price he was to receive was not dependent on the acreage. The court below took as the basis of the settlement between Solmson and Deese the original agency contract under which Deese was to have $49,000, and Solmson the excess, and this without regard to acreage, and the court deducted in the settlement between Deese and Solmson the entire shortage from Solmson's commission. This was properly done, as the sum remaining after that deduction had been made exceeded the contract price of sale ($49,000) upon which Solmson's commission depended.

The decree took care of certain other items which we need not discuss, as Deese was given judgment for the difference between the sum paid him and $49,000, not including the $250 item above mentioned.

The net result of this decree is that the original agency contract is made the basis of the settlement between the parties with the additional allowance of the $250 paid in settlement of the controversy over the accounts of the tenants.

It is finally insisted that too great a deduction was made on account of the shortage in acreage. But we think otherwise. Solmson does not deny his representation in regard to the acreage, and it is undisputed that there are sixty-six acres less than he represented. It is not charged that Solmson knew this representation was false, but it is not essential that that fact be shown. This was a material matter, and he was bound by his representations, however innocently made. *Neely* v. *Rembert,* 71 Ark. 91. It is true Solmson's deed described the land as being 304.26 acres, "more or less," and as was said in the case of *Harrell* v. *Hill,* 19 Ark. 103, these words, "more or less," are descriptive of the premises to be conveyed, rather than a covenant as to quantity; yet it was there also said that when there is a very great difference between the actual and the estimated quantity of acres of land sold in gross relief would be granted on the ground of gross mistake. Here, in a sale of 304.26 acres, a shortage of sixty-six acres exists, a proportionate part

of the whole so large as to constitute a gross mistake. See also *Neely* v. *Rembert, supra; Drake* v. *Eubanks,* 61 Ark. 120; *Haynes* v. *Harper,* 25 Ark. 541.

It is finally argued that the acreage in the sandbar should be taken into account in determining the deduction to be made. But we do not think so, as it appears that the sandbar was not considered in making the sale except as a thing conveyed in addition to the property for which value was paid.

No error appearing, the decree is affirmed.