EQUITABLE DISCOUNT CORP. *v.* TROTTER.

5-2318                                   344 S. W. 2d 334

Opinion delivered March 20, 1961.

*J. Loyd Shouse,* for appellant.

*Villines & Doshier, W. S. Walker,* for appellee.

CARLETON HARRIS, Chief Justice.   Appellant, a New York Corporation, instituted suit against appellee, Dennis Trotter, who operates a grocery-feed store near Harri-

son. The Complaint alleged that Trotter had executed his three negotiable trade acceptances to Ohmlac Paint and Refining Company, Inc., said instruments being given for the purchase of paint by Trotter from Ohmlac. The trade acceptances were in the amount of $365.50 each, and appellant alleged that it had purchased the instruments, in the due course of business, from Ohmlac, and was the owner thereof; that demand had been made for payment, but same was refused. Judgment was sought in the amount of $1,096.50, together with interest from the date of maturity. Trotter answered, and pleaded, *inter alia,* that fraud was exercised in the procuring of the execution of the instruments, and appellant was not an innocent purchaser for value. On trial, appellant's proof consisted solely of the deposition of Joseph Goodwin, president and treasurer of Equitable Discount Corporation, such testimony being taken by interrogatories, and appellee's presentation consisted of the testimony of appellee, and three other merchants of Harrison and neighboring communities. The jury returned a verdict for appellee, and from the judgment dismissing the Complaint, appellant brings this appeal.

Appellant contends that it was entitled to a directed verdict because it was a holder in due course of the negotiable paper, and the contract was breached by appellee, rather than the Ohmlac Company. As stated, appellee's defense was based on the defense of fraud, and the alleged fact that appellant was not an innocent purchaser in due course.

The contract provides that Trotter have an exclusive franchise to sell Ever Plastik Paint, and Trotter contended that Edwards Grocery, operated by Frank Edwards, was sold paint and likewise given an exclusive franchise, by the same salesman, which was purportedly from another company, but actually was a part of the same operation. Edwards testified that he entered into similar contract in 1956 for paint, with a person representing himself as a salesman for Sterling Materials Com-

pany.[1] Eulis McEntire, operator of a store at Everton, entered into a contract in June, 1959, for the purchase of paint with the Sterling Materials Company, and Eugene Allen, operator of a grocery in Summit, Arkansas, in the same month, entered into a contract with Wurtzilite Corporation for the sale of paint in Marion County. All of these companies Ohmlac, Sterling, and Wurtzilite, have store addresses in Long Island City, New York. The operators gave a general description of the salesman who sold them the paint, and the descriptions bore considerably similarity. The contracts offered in evidence were very much alike, several paragraphs being identical with the Trotter contract. Appellant contends that the testimony of these witnesses was inadmissible; points out that the transactions with witnesses McEntire and Allen were nearly three years subsequent to the contract herein involved, and argues that these contracts were with third companies, and in no way connected with any part to this litigation. We think this testimony was admissible as pertinent to appellee's defense of showing a fraudulent scheme to sell paint to various stores, under different brand names, and purportedly from different companies, wherein all the merchants would be given an exclusive franchise. The record reflects that the Allen and McEntire contracts were entered into within three days of each other; both bore several almost identical provisions, *and both included an exclusive franchise for Marion County.* Incidentally, the McEntire contract also reflects another interesting fact in connection with Trotter's allegation that the exclusive listing given him by Ohmlac had been violated because Frank Edwards had also been given an exclusive listing by the Sterling Materials Company (Trotter contending both named companies were actually the same organization). Though Edwards gave a different New York address for Sterling at the time of his purchase, the address the Sterling in the McEntire contract is the same address listed on the 1956 contract between Ohmlac and Trotter. This may, or may not, have significance; the address could refer only to the location of a building housing several different busi-

---

[1] Copy of the contract was not introduced into the record.

nesses or companies. Be that as it may, had Ohmlac instituted this suit instead of the finance company, the evidence heretofore mentioned in support of appellee's defense, would have been sufficient to have made a jury question.

Of course, though it be established that Ohmlac, Sterling, and Wurtzilite were all the same, and selling the same paint under different company names in order to attract additional customers, this would not affect appellant's right of recovery if it were a *bona fide* holder of the trade acceptances, in due course of business. Mr. Goodwin, president of Equitable Discount Corporation, testified that there was no connection of any kind between his company and the Ohmlac Company except that, from time to time, his company buys negotiable paper from Ohmlac. He testified that Ohmlac likewise sold to other finance companies and banks in New York, and that his own company purchases negotiable instruments from other businesses. He stated that none of the officers, trustees, stockholders, or employees, of Ohmlac were in any way connected with or interested in the Equitable Corporation, nor any of the like Equitable officers or employees connected with the Ohmlac Company. The offices, according to Goodwin, are about nine miles apart. The witness testified that his company had no knowledge or suggestion of defects at the time it purchased the acceptances. According to Goodwin, the company had purchased many acceptances from the Ohmlac Company, endorsed by Jacob Nadler, secretary of the Ohmlac Company. Under our holdings in *Metropolitan Discount Company* v. *Fondren,* 121 Ark. 250, 180 S. W. 975, and *Metropolitan Discount Company* v. *Flippo,* 163 Ark. 331, 260 S. W. 32, we think the testimony was sufficient to submit to the jury the issue of whether Equitable Discount Corporation was a *bona fide* holder. In those cases, this Court affirmed judgments which, in effect, found that the discount company was not an innocent purchaser of acceptances. The proof showed that the company had purchased negotiable paper from a company selling junk jewelry. The evidence relating to the discount company

established that it had been doing business with the jewelry concern for a long number of years; that the acceptances involved were not protested when appellees refused to pay them, and no effort was afterwards made to collect them from the novelty company. In the *Fondren* case, the proof reflected that the company purchased the acceptances for cash and 10% discount, and, in both cases, officials of the company testified that the paper was purchased in good faith for value received, and that the two corporations were entirely independent of each other and had no common officers or stockholders. In the instant case, the evidence of Goodwin showed that his company had been doing business with Ohmlac for a considerable period of time; there was likewise no protest or effort to collect from Ohmlac when appellee refused to pay, and there are additional facts much stronger than those in the *Metropolitan* cases, which pertain to the question of whether Equitable was a *bona fide* purchaser for value in due course of business. For instance, the trade acceptances were signed by Trotter on August 8, 1956, at his store several miles from Harrison, Arkansas. *Two days later*, in New York City, Equitable purchased these acceptances from Ohmlac, and the finance company directed a letter to Trotter on that date. Also, the testimony of Goodwin reflects that the discount corporation paid $768 for these three acceptances, which totalled $1,096.50. The discount was, accordingly, $328.50—approximately 30%. This would seem an exceedingly high discount for a *bona fide* purchase of notes due within five months. We conclude that the evidence was sufficient to go to the jury on this point.

However, we feel that the court erred in admitting certain testimony, objected to by appellant, and this error necessitates a reversal of the judgment. We have many times held that where error is committed, such error will be treated as prejudicial unless it be shown that the appellant was not prejudiced thereby. *State National Bank of Texarkana* v. *Birmingham,* 166 Ark. 446, 266 S. W. 76. The testimony, hereafter referred to, could well have influenced the verdict of the jury, particularly since one

of the other merchants testified in a like manner. Trotter stated that the representative of the paint company told him that the paint would be shipped to him prepaid, and after it arrived, the company would send a representative to sell the paint; that Trotter would simply be the distributor. When the paint arrived, $108 in freight charges was due; Trotter refused to pay, and the paint was eventually sold to pay storage and freight. The contract, titled "Exclusive Franchise for Ever-Plastic dealership", and offered in evidence, refutes Trotter's contention, since it very clearly provides that prices are f. o. b. from the factory, and it is understood "that the merchandise becomes the property of the purchaser when receipted for by the transportation company." Section 6 provides that if a dealer will send the name and address of prospects to the Sales Promotion Department, said department "will use its efforts solely through direct correspondence to assist the Dealer with these prospects." It is further provided that "The facilities and cooperation agreed by the Company hereunder to be made available to the Dealer are designed to assist him to make the most of his Ever Plastik Franchise, but under no conditions are they to be construed, directly or by inference, to mean that the Company will sell the material for the Dealer, or that the Dealer is not obligated to pay for the Ever Plastik before it is sold." Admittedly, a copy of the instrument was given to Trotter at the time the transaction was entered into, and he accordingly was not in the position of being forced to rely on any purported oral representations made to him; there was no reason, therefore, for him to be misled as to the freight charges and assistance the company was to render in selling the paint. We have held that where a contract of sale is in writing and recites that it constitutes the entire agreement between the parties, parol evidence is not admissible to vary the terms of the agreement. *Hambrick* v. *Peoples Mercantile and Implement Co.*, 228 Ark. 1021, 311 S. W. 2d 785. *Federal Truck & Motors Co.* v. *Tompkins*, 149 Ark. 664, 231 S. W. 553. It is true there are exceptions to this rule, and we have several times held that even though the contract provided that the written instru-

ment constituted the entire agreement between the parties, oral testimony was admissible to contravene this recitation. However, the facts in this case do not warrant the submission of this testimony. Trotter does not allege in his pleadings, nor in his oral evidence, that he executed the contract solely because of reliance upon these representations; there is no allegation, nor proof, that these two matters (freight charges prepaid and company aid in selling paint) constituted the inducement which prompted him to sign. Nor is there any evidence that the salesman, by act, or artifice, prevented Trotter from reading the contract; or that it was in small print; or that Trotter had no opportunity, because of stress of business, or poor education, of ascertaining the contents of the instrument. It appears that ordinary prudence and diligence would have required Trotter, in dealing with a man that, as far as the record shows, he had never seen before, to read the instrument which he was signing, and which obligated him to pay out over a thousand dollars.

The instructions have not been abstracted, and we therefore do not examine them. The fact that we do not discuss the instructions does not mean that we approve them.

Summarizing, the testimony of the merchant witnesses (Edwards, Allen and McEntire) relates to a fraudulent scheme allegedly concocted to induce merchants to sign contracts for an exclusive area paint franchise. The admission of this testimony in no wise varies the terms of the agreement, for Trotter was entitled, under the contract, to such a franchise, and the testimony was accordingly relevant, pertinent, and admissible.

On the other hand, the testimony relating to the statement by the salesman that freight charges would be paid and the paint sold by the company, is completely at variance with the written agreement, and the circumstances do not show any necessity for Trotter's reliance upon these representations.

Because of the error heretofore mentioned, the judgment is reversed, and the cause remanded.