391 So.2d 97 (1980)
C.A. SPRAGINS, Sr., et al.
v.
LOUISE PLANTATION, INC., et al.
No. 52252.
Supreme Court of Mississippi.
December 3, 1980.
*98 Charles S. Tindall, Frank S. Thackston, Jr., Lake, Tindall, Hunger & Thackston, Greenville, for appellants.
Philip Mansour, Mansour & Thomas, Greenville, for appellees.
Before PATTERSON, C.J., and WALKER and BROOM, JJ.
BROOM, Justice, for the Court:
Sales contracts involving farm lands situate in Arkansas are background to this action appealed from the Chancery Court of Washington County. Under the terms of the four contracts appellants (C.A. Spragins, Sr. and his children, Ruth S. Cranston, Martha Veal, and C.A. Spragins, Jr.-Spragins herein) agreed to sell the lands to Kay R. Taylor. Refusal of the Spragins to convey one of the farms resulted in this specific performance suit filed by complainants/appellees Taylor and Dough Boy, Inc., Louise Plantation, Inc. and Huber Farm Service of Greenville, Inc., each being a Mississippi corporation. The lower court declined to order specific performance but awarded Taylor and the three corporations damages of $112,576, plus Taylor's $30,000 down payment, totalling $142,576. From that award, the Spragins appeal, and Dough Boy cross-appeals from failure of the lower court to award Dough Boy $80,000 for services rendered.
On their direct appeal, the Spragins argue that the lower court erred in: (1) excluding the oral and documentary evidence offered by Spragins to show that Kay R. Taylor was a broker throughout and that she violated her fiduciary obligations; (2) failing to find the sales contract unenforceable under Arkansas law; (3) failing to find that Mrs. Taylor breached her fiduciary duties as a broker; (4) finding that appellant Ruth Cranston breached the sales contract; (5) dismissing the $80,000 claim for commission without prejudice; and (6) failing to order the execution by appellee Louise Plantation, Inc. of the deeds requiring the corporation's signature and delivery to effect vesting of title in appellants Spragins.
Background to this litigation are the following facts related to four farms in Chicot County, Arkansas. C.A. Spragins, Sr. owns two of the farms known as "Caney Bayou" and "Edith." His daughter, Martha Veal, owned "Indian" farm and his other daughter Ruth S. Cranston owned the other farm known as "Emenheiser" or "Boeuf River." By contracts dated June 20, 1978, Spragins (representing himself and his daughters) granted Kay R. Taylor an option to purchase each farm; these contracts provided an expiration date of August 10, 1978. Attached to each option contract was a document authorizing Taylor to locate and sell to a purchaser the land and in return she would be paid a five percent commission. The attached document provided that Spragins gave to Taylor permission to
cooperate with a broker or brokers in or out of the State of Mississippi using your own judgment in this matter.
At trial Spragins offered into evidence these option contracts and attached documents which the chancellor excluded on the ground that such evidence was an attempt to vary the terms of a subsequent contract sued upon and that the offered documents pertaining to the June 20, 1978 contracts *99 had become merged into a subsequent contract dated October 24, 1978. The latter contract identified Taylor as simply a "purchaser" whereas the June 20th contract and attached document indicated that Taylor was acting as a "broker" in the sale of the land.
In Cause No. 38,703, C.A. Spragins, Sr. and wife Olivia W. Spragins, as complainants, sued Taylor, Dough Boy, Inc. and Louise Plantation, Inc. averring that the sale of the "Edith" farm had been consummated except Taylor and the two corporate defendants had refused to deliver unto appellants Spragins certain deeds conveying land that was to be swapped to the Spragins. In this action the Spragins sought delivery of proper conveyance of title from Louise Plantation so as to vest in the Spragins title to the land which was to be swapped to them.
In Cause No. 38,844 below the complaint as amended was filed by complainants (appellees and cross-appellants here) Louise Plantation, Inc., Kay R. Taylor, and Dough Boy, Inc. seeking the following relief: (1) specific performance conveyance of Ruth Cranston's farm as contracted in the October 24, 1978, sales contract-sales of the other three farms were consummated and not in issue here; the Cranstons who refused to consummate sale of their "Emenheiser" or "Boeuf River" farm were not involved in the other transactions; C.A. Spragins, Sr. and C.A. Spragins, Jr. were joined as defendants because they acted for Mrs. Cranston. (2) Taylor sought recovery of $100,000 for loss of profits by her. (3) Dough Boy, Inc. sought $80,000 for services rendered regarding the consummated sales of lands. In this connection it is to be noted that attached to the October 24, 1978, contract was a letter addressed to Dough Boy, Inc., signed by C.A. Spragins, Jr., Attorney in Fact as "owner," and "Kay R. Taylor, Pres." above a line under which was typed "ACCEPTED." This letter stated:
Upon sale and closing of my property located in the County of Chicot, State of Arkansas, consisting of 1600 acres, at a price of $1,000.00 per acre, you shall be paid $80,000.00 for services rendered.
Both causes were consolidated at trial. Spragins argues, in the main, that Kay R. Taylor was a "broker" throughout each of the transactions set forth above, that she violated her fiduciary obligations by failing to reveal that she represented other interests and made secret profits on the three transactions closed and, that under Arkansas statutes she acted as a "real estate broker" without an Arkansas license. Spragins, therefore, contends that the sales contract under which she claimed loss of profits for herself and a fee for services rendered by her corporation Dough Boy was unenforceable. We agree.
Before examining the facts before us, however, we must first address and resolve two preliminary issues: (1) does Arkansas or Mississippi law apply, and (2) does the parol evidence rule apply.

DOES ARKANSAS OR MISSISSIPPI LAW APPLY?
It is true that Mrs. Taylor and the appellants are all Mississippi residents; but the four farms in question are all located in Arkansas. Although the contracts were entered into in Arkansas, negotiations occurred in Mississippi, Arkansas, and Tennessee. The sale of three of the farms was concluded in Tennessee.
In cases involving a choice-of-law or conflict-of-law problem, this Court has adopted the center of gravity doctrine or the most significant relationship test. As Justice Rodgers noted in Craig v. Columbus Compress & Warehouse Co., 210 So.2d 645, 649 (Miss. 1968):
This doctrine is a rule whereby the court trying the action applies the law of the place which has the most significant relationship to the event and parties, or which, because of the relationship or contact with the event and parties, has the greatest concern with the specific issues with respect to the liabilities and rights of the parties to the litigation. 15A C.J.S. Conflict of Laws § 8(2) (1967).
In order to determine the most significant relationships, this Court has looked to Restatement *100 (Second) of Conflict of Laws for guidance. In Mitchell v. Craft, 211 So.2d 509, 515-6 (Miss. 1968), Chief Justice Ethridge quoted extensively from Restatement (Second). Especially helpful in identifying choice-influencing considerations and the most significant relationship is § 6 of Restatement (Second) of Conflict of Laws:
§ 6. Choice-of-Law Principles
(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.
(2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include
(a) the needs of the interstate and international systems,
(b) the relevant policies of the forum,
(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
(d) the protection of justified expectations,
(e) the basic policies underlying the particular field of law,
(f) certainty, predictability and uniformity of result, and
(g) ease in the determination and application of the law to be applied.
In order to determine the conflict of law issue, this Court needs to examine the apposite statutory provisions of both states. Ark.Stat.Ann. § 71-1309 (Repl. 1979)[*] outlines the procedure involved for a non-resident real estate broker to transact business in the state. A non-resident real estate broker may associate with a resident broker in order to comply with the statutory requirements. See Mississippi Code Annotated § 73-35-11 (1972).
Spragins asserts that the chancellor was manifestly wrong in failing to find the sales contract unenforceable under Ark.Stat.Ann. § 71-1301 (Repl. 1979)[*] because Taylor did not secure a real estate license in Arkansas. Violation of the statute is punishable criminally by fine and imprisonment. See Mississippi Code Annotated § 73-35-31 (1972).
Real estate broker is defined by Ark.Stat. Ann. § 71-1302 (Repl. 1979)[*] as one who "sells (or) ... purchases... . for another with the intention ... of receiving any valuable consideration... ." The statute also disallows an unlicensed broker to bring suit for his fee in state court.
The licensing provisions of both Arkansas and Mississippi were enacted to protect sellers of real estate from unconscionable brokerage practices. Neither state's policy is in conflict with the other. Arkansas rather than Mississippi, however, appears to have more significant contacts with the issues. Although the location of the land is not the overriding consideration, that coupled with the fact that all of the contracts and brokerage agreements were executed and signed in Arkansas gives Arkansas more of an interest in the case. The parties, in addition to the foregoing reasons, probably expected Arkansas law to be applied especially since they failed to include a choice of law clause in any of the documents and because the land deeds had to be recorded in Arkansas.
UNDER ARKANSAS LAW, DOES THE PAROL EVIDENCE RULE BAR THE ADMISSION OF THE JUNE 1978 CONTRACTS AND BROKERAGE AGREEMENTS, THE OCTOBER 1978 DOUGH BOY LETTER, AND ORAL TESTIMONY RELATING TO THESE DOCUMENTS IN ORDER TO SHOW THAT MRS. TAYLOR VIOLATED A FIDUCIARY DUTY SHE OWED TO THE SPRAGINS?
The Arkansas Supreme Court has noted that there are a number of exceptions to the parol evidence rule and instances when the rule has no application. Parol Evidence may be admitted to show the illegality of a written agreement. Farmers Cooperative Ass'n v. Garrison, 248 Ark. 948, 454 S.W.2d 644, 646-7 (1970); Roe v. Kiser, 62 Ark. 92, 34 S.W. 534, 535 (1896). Our sister Court has also held that the parol evidence rule does not prevent introduction *101 of extrinsic evidence to prove an independent, collateral fact. Lane v. Pfeifer, 568 S.W.2d 212, 215 (Ark. 1978); Loe v. McHargue, 239 Ark. 793, 394 S.W.2d 475 (1965); Equitable Discount Corp. v. Trotter, 233 Ark. 270, 344 S.W.2d 334 (1961). Noting the exceptions to the parol evidence rule, we may now apply Arkansas law and examine chronologically the events surrounding the Arkansas land transactions.

DID MRS. TAYLOR VIOLATE THE FIDUCIARY DUTY OWED TO APPELLANTS?
The facts in this case reveal that Taylor failed to disclose material information to the Spragins. On June 20, 1978, C. Allen Spragins, Jr. and Taylor signed brokerage agreements and option contracts for the sale of four Arkansas farms. Although the option contracts expired on August 10, 1978, no buyers were secured; consequently, Taylor obtained several extensions and on October 24 the sale contracts were executed.
In August 1978, Taylor contacted E.L. Hutton, a Memphis attorney, to see if he had any client interested in the Arkansas property. In order to exercise the option contract, a deposit was required for each farm. Taylor arranged by telephone with Hutton for him to wire $100,000 in down payment money. The $30,000 September 6, 1978 down payment check on "Emenheiser" was signed by Kay Taylor and made payable to C.A. Spragins, Sr. and/or Ruth Cranston. Hutton had wired the money to the Bank of Cleveland, Cleveland, Mississippi, on behalf of Huber Farm Services of Greenville. Although Taylor had difficulty recalling on whose behalf Hutton acted, she did acknowledge that she was vice-president and owned one-third of the stock of Huber Farms.
Prior to signing the October 24 sales contracts and Dough Boy letters, Taylor's attorney, James W. Haddock of Lake Village, Arkansas, advised her to associate with an Arkansas broker in order to comply with Ark.Stat.Ann. § 71-1309 (Repl. 1979). Taylor, however, with the approval of Mr. Spragins, elected to purchase the property in her own name.
We note that neither prior to nor on October 24, 1978, did Taylor make any disclosure to appellants that she was a stockholder, director, and officer in Huber Farm Services or that the corporation might acquire the four farms. Appellants' testimony, if admitted, was that no such disclosure was ever made. Additionally, Taylor failed to inform appellants that Huber Farm Services planned to sell the properties for a profit.
Taylor, who gave information about the farms to Hutton, testified that after October 24 she showed the properties to some of Hutton's "clients." Her testimony was that before the March 14th closing she had compiled maps, soil studies, yield studies and made determinations of what could be planted. She gave this information to Hutton at the Greenville office of Huber Farm Services of Greenville. Additionally, her testimony was that she showed the Tate property to a German investor, Mr. Brockerman, who was referred to her through the Hubers and sent to the Greenville office; Brockerman later bought the Tate property through arrangements of Mr. Feltus, the buyer's attorney. Taylor showed the Edith place to a husband and wife (whose name she forgot) who bought it through assistance of Feltus, their representative. The Cranston property was also shown to one Saulters, a German investor. According to Taylor, when she showed the properties to Brockerman and to the buyers of the Edith property, she did not discuss price with them; they got the price from their lawyer, Feltus, who would have gotten the price either from her or from Huber Farm Services of Greenville. She did not know whether any price above what was paid Mr. Spragins was discussed and stated, "I just presented the farm, showed the farm." She further stated that the only compensation she had received from the three transactions which were closed was the amount agreed on with Spragins and that she expected no more from the Cranston transaction.
*102 At the February 28, 1979 closing involving the Caney Bayou property, a "seller's account" closing statement was prepared on a printed form, setting forth printed descriptions of customary deductions such as proration of taxes, closing fees, notary fee, etc., including a "real estate commission." On the "seller's account statement" prepared and used on February 24, 1978, opposite the words "real estate commission" appears the words and figures "Dough Boy, Inc. $47,719.00." Similarly, on the "seller's account statement" form, prepared and used for the Edith Farm closing, there was shown opposite real estate commission "Dough Boy, Inc. $63,750.00." As concerns the Cranston lands, a "seller's account" statement was prepared but was not signed. On the line indicating "real estate commission" appears "K.R. Taylor $80,000.00."
While taking the Huber Farms deposition, appellants' attorney, Mr. Terney, discovered a document that set out anticipated profits that Huber Farms would make from the sale of each piece of property. The list indicated that Huber Farm Services of Greenville, Inc. made or would make profits of: $24,000.00 on the Veal property (Indian Plantation), $98,122.30 on the Caney Bayou property, $108,375.00 on the Edith Farm property, and $112,576.00 was contemplated on the Cranston land (Emenheiser Farm).
Clear from the record is the fact that, according to her own testimony, up and until the time of lapsing of the June 20, 1978 option contracts, Taylor's status was that of a broker which she attempted to change to "purchaser" by the October 24 sales contracts. As a broker she was obligated to reveal to her principals (appellants) all information possessed by the broker concerning the value of the property. The broker must obtain for the principal the best available deal without withholding any information the broker has which is adverse to the principal. The broker must reveal the source and amount of any profit she may make from the transaction, including any relationship she has with any other party to the transaction. In Phillips v. Arkansas Real Estate Commission, 244 Ark. 577, 426 S.W.2d 412, 416 (1968), appellant, an unlicensed real estate broker, was enjoined from enforcing any right out of the land sale in which he participated. In order to avoid having to comply with Ark.Stat. Ann. §§ 71-1301, 71-1302 (Repl. 1957), the appellant arranged to purchase property for himself and, in turn, sell it at a profit to his client. As Chief Justice Harris noted, "We think the instruments ... make it clear that the proposed `purchase' ... was only a means used to evade the statute... ." Ellsworth v. Benedict, 216 S.W.2d 392 (Ark. 1949). Secret profits are not allowable to the broker. 12 Am.Jur.2d Brokers § 86 (1964).
The appellees argue and the chancellor so found, that when Taylor became "purchaser" under the October 24, 1978, contract, all prior negotiations and the earlier June 20, 1978, contracts, whether expired or not, were merged or superseded by the October purchase contract. On that basis all evidence of the matters prior to October 24th were in effect excluded with the chancellor ruling that parol evidence would not be permitted to vary the terms of the October contracts. The chancellor further ruled that he considered all of the evidence for the purpose of establishing an exception to the parol evidence rule and in that context found that the evidence was insufficient to meet the standard of clear and convincing proof. He concluded: there was no principal and agent relationship between the parties; Taylor was not a fiduciary; and Arkansas statutes did not apply. We think his ruling in this regard is contrary to the overwhelming weight of the evidence and manifestly in error.
Regardless of what did or did not occur prior to October 24, 1978, when the last sales contract was executed, we think the Dough Boy, Inc. letter attached to each of the sales contracts makes it clear that Taylor was acting as a broker. She owned 60% of the stock in Dough Boy, and her minor son owned the remaining 40%. There is no denial that the Dough Boy letters were attached to the contracts and must be considered along with the contracts *103 as part of the same transaction. Each of the contracts provided that "this contract is executed simultaneously with three other contracts ... none of the properties which are subject to this contract and the three other contracts shall be conveyed unless all of the properties are conveyed pursuant to each contract." Appellees sued for $80,000 (and other relief) under the contract related to the Cranston farm to which was attached the letter signed by Spragins as attorney-in-fact as owner and signed by Taylor as president of Dough Boy providing that there would "be paid $80,000 for services rendered." The letter provided for the payment "[U]pon sale and closing of my property in ... Arkansas, consisting of 1600 acres, at a price of $1,000 per acre... ." Eighty thousand dollars sued for here is exactly five percent of the sales price. Five percent of the sales price in each contract would total $230,769. Taylor's explanation of "services rendered" was preparation of "soil and area maps and yield data" on the farms. Language in appellees amended complaint in Cause No. 38,844 shows the following averment:
That defendants agreed to a price of $950.00 per acre with the additional $50.00 per acre being added as compensation to Dough Boy, Inc. for services rendered in the sale of said land.
The words "for services rendered in the sale of said land" (emphasis added) is strong indication that the $80,000 was a broker's commission.
Our view is that all the negotiations and transactions, before and after October 24, 1978, appearing in the record were so closely connected, inter-related, and continuous that they cannot be separated and thereby exclude the June 20, 1978 contracts and actions the parties took thereunder. The June 20th contracts appear to have been placed in the record for "identification only."
We cannot accept appellees' argument that (a) the Arkansas statute is unavailing to appellants because Taylor was "purchaser" and not "broker," and (b) that the contract sued upon is only "unenforceable" (not "void") in the courts of Arkansas. Upon the record we hold that Taylor is an individual who for another "for compensation" was acting as a real estate broker and that under the Arkansas statute the contract relied upon by appellees is void so far as Taylor is concerned. Sarkco, Inc. v. Edwards, 482 S.W.2d 623 (Ark. 1972); Phillips v. Arkansas Real Estate Commission, 244 Ark. 577, 426 S.W.2d 412 (Ark. 1968); Dunn v. Phoenix Village, Inc., 213 F. Supp. 936 (D.C.Ark. 1963); Solmson v. Dees, (Ark. 1920), 142 Ark. 189, 218 S.W. 657.
The chancellor in Cause No. 38,844 correctly refused to award appellees/cross-appellants recovery of the $80,000 although he dismissed the claim for $80,000 "without prejudice." As stated above the $80,000 was in fact for brokerage actions of Taylor who was unlicensed as a broker and, therefore, the claim for $80,000 is not enforceable and should have been dismissed "with prejudice" which will be done by order to issue here. That part of the decree ordering appellants Ruth S. Cranston and Phillip Cranston to refund to Taylor the $30,000 down payment is affirmed but the award of $112,576 damages will be reversed and rendered, and judgment to that extent entered here.
Cause No. 38,703, relates to the property owned by C.A. Spragins, Sr. and Olivia W. Spragins who contend they are entitled to an order requiring the corporate defendants Dough Boy and Louise Plantation to deliver the Spragins certain deeds in a land swap. Noting that there was no proof of damages to the Spragins in this regard, the lower court dismissed with prejudice their bill in Cause No. 38,703. In this we find no error. We noted at oral argument that counsel no longer sought relief as to this aspect of the case.
Accordingly, we must reverse in part the decree in Cause No. 38,844 so that: the appellees/cross-appellants claim for $80,000 will be dismissed with prejudice; we affirm as to refund of $30,000 down payment made by appellees to Taylor; we reverse and render as to the award of $112,576 profit to appellees.
*104 AFFIRMED IN PART; REVERSED IN PART, AND RENDERED.
PATTERSON, C.J., SMITH and ROBERTSON, P. JJ., and SUGG, WALKER, LEE, BOWLING and COFER, JJ., concur.

APPENDIX
Ark.Stat.Ann. § 71-1309 (Repl. 1979).
71-1309. Nonresident real estate brokers-Prerequisites to doing business in Arkansas.-A nonresident of this State who performs any of the acts of a real estate broker or a real estate salesman within this State must conform to all of the provisions of this Act [§§ 71-1301-71-1311], including the maintenance of an office in Arkansas; provided, however, that in lieu of the maintenance of an office in Arkansas, such broker or salesman may operate through or in conjunction with a resident real estate broker licensed under the provisions of this Act, ...
[Acts 1929, No. 148, § 9, p. 742; 1931, No. 142, § 1[9], p. 380; Pope's Dig., § 12484.]
Ark.Stat.Ann. § 71-1301 (Repl. 1979).
71-1301. Acting as real estate broker or salesman without license unlawful-Penalty.-It shall be unlawful for any person ... to act as a real estate broker or real estate salesman in Arkansas or to advertise or assume to act as such real estate broker or real estate salesman without first having complied with every provision of this Act [§§ 71-1301-71-1311] and having secured a regular, valid license issued by the Arkansas Real Estate Commission, authorizing the performance of such acts... . Any person violating the provisions of this Section shall be guilty of a misdemeanor and shall upon conviction thereof be fined in a sum not less than two hundred and fifty dollars ($250.00) nor more than one thousand dollars ($1,000.00), or be imprisoned in the county jail not less than thirty (30) nor more than ninety (90) days, or be both so fined and imprisoned. [Acts 1929, No. 148, § 1, p. 742; Pope's Dig., § 12476; Acts 1953, No. 98, § 1, p. 287.]
Ark.Stat.Ann. § 71-1302 (Repl. 1979).
71-1302. "Real estate broker" and "real estate salesman" defined-Parties excepted from act-Complaint to recover commission-violations.-A real estate broker within the meaning of this Act [§§ 71-1301-71-1311], means an individual other than a real estate salesman, who for another, and for compensation or the expectation of compensation: (a) sells, exchanges, purchases, rents, or leases real estate. (b) offers to sell, exchange, purchase, rent, or lease real estate. (c) negotiates, offers, attempts, or agrees to negotiate the sale, exchange, purchase, rental or leasing of real estate. (d) lists, offers, attempts, or agrees to list real estate for sale, lease, or exchange... .
Any person who directly or indirectly for another with the intention, or on the promise, of receiving any valuable consideration, offers, attempts, or agrees to perform any single act described in this subsection, whether as part of a transaction, or as an entire transaction, shall be deemed a broker or salesman within the meaning of this Act, the commission of a single such act, by a person, required to be licensed under this Act and not so licensed, shall constitute a violation of this Act.
* * * * * *
No recovery may be had by any broker or salesman in any court in this State on a suit to collect a commission due him unless he is licensed under the provisions of this Act and unless such fact is stated in his complaint. [Acts 1929, No. 148, § 2, p. 742; 1931, No. 142, § 1[2], p. 380; Pope's Dig., § 12477; Acts 1975, No. 482, § 1, p. 466-A.]
NOTES
[*] Arkansas statutes are reprinted in part in Appendix.