**Byron G. DUNN, Plaintiff,**

v.

**PHOENIX VILLAGE, INC., a Corporation, and S. B. Holley, Jewell Morris, Wilson Hatfield, Wendell Johnson, Charles Fite and Richard L. Martin, Defendants.**

**Civ. A. No. 1657.**

United States District Court
W. D. Arkansas,
Fort Smith Division.

Feb. 14, 1963.

Andrew Wilcoxen, Muskogee, Okl., Warner, Warner & Ragon, Fort Smith, Ark., for plaintiff.

White & Martin, Fort Smith, Ark., for defendants.

JOHN E. MILLER, Chief Judge.

The findings of fact and conclusions of law are included herein in lieu of the filing of findings of fact and conclusions of law separately stated as authorized by Rule 52(a), Fed.R.Civ.P.

The plaintiff, Byron G. Dunn, is a citizen of Oklahoma and a resident of the City of Muskogee in said State. The defendant, Phoenix Village, Inc., is a corporation organized and existing under the laws of the State of Arkansas with its principal place of business in the City of Fort Smith, Arkansas. The individual defendants are citizens of the State of Arkansas and reside in the City of Fort Smith.

The "matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs."

The court has jurisdiction of the cause of action and the parties.

On June 18, 1962, plaintiff filed his complaint in which he alleged that on or about April 15, 1960, at the request of the defendants, he undertook to secure for and on behalf of defendants a mortgage loan on certain lands and proposed buildings in the City of Fort Smith, Arkansas, for the purpose of enabling the defendants to secure the financing necessary for the construction of a shopping center; that the individual defendants were acting in their "separate, several and individual capacity for and on behalf of their own interest, and were also acting as the authorized agents of the defendant corporation"; that from April 15, 1960, to on or about October 1, 1961, the plaintiff performed services as requested of him by the defendants, including, but not limited to, "the preparation of financial statements, the securing of a leasing agent, the preparation of loan applications, the securing of adequate interim financing, and the securing of loan commitments for permanent financing"; that as a result of the efforts of the plaintiff, commitments were secured from lending agencies in the sum of $450,000.00 by the defendants, and "as a result of the services of the plaintiff, the defendants were able to and did construct the shopping center"; that the defendants accepted the services of the plaintiff "with the knowledge that they were being rendered on behalf of said defendants with the expectation on the part of the plaintiff of receiving payment therefor, and that under all the circumstances said defendants knew that they were not gratuitous, but were rendered by the plaintiff with the expecta-

tion of compensation. That said services were beneficial to all of said defendants."

He prayed judgment against all of the defendants "for the reasonable value of his services in the amount of $25,000.-00 and his costs herein expended."

On July 5, 1962, the defendants filed their motion for a more definite statement, in which they alleged in paragraph numbered I that the plaintiff should be "required to state the facts supporting his conclusion that he was employed to secure the financing necessary for the construction of a shopping center, by stating whether the alleged contract was in writing or oral and, if in writing, by furnishing a copy thereof, or if oral, by setting forth the essential terms thereof including the name of the proposed borrower of the alleged mortgage loan."

In paragraph V of the motion the defendants alleged that the plaintiff should be "required to state facts supporting his conclusion that defendants 'accepted the services of plaintiff with the knowledge that they were being rendered on behalf of said defendants with the expectation on the part of the plaintiff of receiving payment therefor and that under all the circumstances said defendants knew that they were not gratuitous but were rendered by plaintiff with the expectation of compensation', by stating whether plaintiff's expectation of compensation was based upon the alleged contract in paragraph II of the complaint or some other unrelated contract and, if the latter, whether it was in writing or oral and, if in writing, by furnishing a copy thereof, or if oral, by setting forth the essential terms thereof."

On July 9, 1962, the court entered an order upon said motion, by which the plaintiff was ordered to amend paragraph 2 of the complaint "by alleging whether the contract between the plaintiff and defendants was in writing or oral. If in writing, a copy of said contract shall be set forth in the amendment, and if oral, the plaintiff shall allege the essential terms and also the name of the proposed borrower of the mortgage loan."

The court further directed that the plaintiff "clarify whether his claim is based upon the original contract, and whether the plaintiff and the defendants regarded the contract as in full force and effect when a loan was finally accepted by the defendants."

In accordance with the order of the court, the plaintiff on July 17, 1962, filed his amended complaint in which he restated in substance the allegations contained in the original complaint and further alleged:

"* * * That the agreement between the plaintiff and the defendants was an oral agreement made in March, 1960, in the City of Fort Smith, Arkansas, and affirmed at various times subsequent thereto, by the terms of which the plaintiff agreed to devote his efforts to secure financing for the defendant corporation, and specifically to secure a mortgage loan commitment acceptable to the defendants, and the defendants agreed to pay a broker's fee of three (3%) percent, plus expenses, of the amount actually borrowed, or to compensate the plaintiff by permitting him to write life insurance on the lives of the individual defendants, to be owned by the corporation, in the amount of the capitalized structure of the shopping center, and to further permit said plaintiff to place all property insurance on the structure to be built."

On July 25, 1962, subsequent to the filing of the amended complaint, the defendant corporation filed its separate answer in which it denied entering into any agreement, express or implied, with plaintiff in March, 1960, or at any other time "and specifically denies that it agreed to pay a broker's fee of 3%, plus expenses, of the amount actually borrowed or any other fee or expenses, or to compensate plaintiff by permitting him to write life insurance to be owned by this defendant or any other corpora-

tion, firm or individual, on the lives of the individual defendants in this action, in the amount of the capitalized structure of said shopping center or any other amount, or to permit plaintiff to place any other insurance on any other structure; but, on the contrary, alleges that this defendant, through its officers, agents and employees did, at or about the time alleged by plaintiff, commence negotiations with the Great Southern Life Insurance Company, a corporation organized under the laws of the State of Texas and authorized to do business in the State of Arkansas, for a loan for the construction of a shopping center and that plaintiff, representing himself to be an officer of and agent for said insurance company, did represent exclusively the interests of said insurance company throughout such negotiations with this defendant and time and time again assured this defendant there was not, nor would there be, any charge or other obligation on the part of this defendant to plaintiff individually."

The corporate defendant admitted that the individual defendants were acting as the authorized agents for it but denied all other allegations pertaining thereto; that the plaintiff did prepare a loan application but that the application prepared by plaintiff "was directed to his principal, said Great Southern Life Insurance Company, while he was acting within the scope of his authority as agent for said company and not as the result of any separate agreement with, or as agent for, this defendant."

The defendant admitted that it received a loan commitment in the sum of $450,000.00 from Great Southern Life Insurance Company which it at first accepted but later rejected, and upon rejection of the loan commitment, "it forfeited and paid to said insurance company the sum of $4,500.00 as liquidated damages, and that previous thereto plaintiff had repeatedly stated to this defendant through its officers, agents and employees that in the event of such rejection, such forfeiture would be the only charge against this defendant."

That at all times while the negotiations were in progress, "plaintiff did not intend or expect to charge this defendant for any services by him rendered or to be rendered, his only intention and expectation being to create a favorable climate for the prospective sale to this defendant of an insurance-funded stock redemption plan and, further, that plaintiff reiterated time and time again that there was not nor would there be any obligation on the part of this defendant to purchase any such plan."

On July 25, 1962, the individual defendants filed their motion to dismiss the original and amended complaint on the ground that a claim was not stated against them or any of them.

On July 26, 1962, the motion of the individual defendants was denied on the ground that the original complaint and the amended complaint raised a question of whether the defendants in the negotiation of the contract were acting as agents of Phoenix Village, Inc., or whether they were acting in a dual capacity, and whether there was a meeting of the minds of the plaintiff and the defendants "that the individuals assumed a responsibility to the plaintiff along with their alleged principal, Phoenix Village, Inc."

Following the overruling of the motion to dismiss, the individual defendants on August 3, 1962, filed their joint answer, in which they in effect denied all the allegations contained in the original and amended complaint as hereinbefore referred to.

On August 7, 1962, plaintiff filed a motion for production of documents which the defendants promptly furnished to the satisfaction of plaintiff, and an order was entered on October 30, 1962, overruling said motion.

Upon the issues joined the cause proceeded to trial to the court on January 10, 1963. Upon the completion of the presentation of evidence by the plaintiff, all the defendants moved for a dismissal of the complaint and the amendment thereto. The court reserved action on said motion. Then the individual de-

fendants moved for dismissal of the original and amended complaint, and the court sustained said motion and dismissed the original and amended complaint against the individual defendants.

The original complaint and the amended complaint having been dismissed as against the individual defendants, the claim of plaintiff against the defendant corporation, Phoenix Village, Inc., was submitted and taken under advisement subject to the submission of briefs by the attorneys for the parties in support of their respective contentions, which briefs have been received and considered along with all the evidence and the exhibits.

It will be noted that the plaintiff in his original complaint sought a recovery for the reasonable value of his service in the amount of $25,000.00 and his costs herein expended. By his amended complaint he alleged that the agreement between himself and the defendants was oral, and that "the defendants agreed to pay a broker's fee of three (3%) percent, plus expenses, of the amount actually borrowed, or to compensate the plaintiff by permitting him to write life insurance on the lives of the individual defendants, to be owned by the corporation, in the amount of the capitalized structure of the shopping center, and to further permit said plaintiff to place all property insurance on the structure to be built."

The corporate defendant in its answer alleged that "plaintiff did not intend or expect to charge this defendant for any services by him rendered or to be rendered, his only intention and expectation being to create a favorable climate for the prospective sale to this defendant of an insurance-funded stock redemption plan and, further, that plaintiff reiterated time and time again that there was not nor would there be any obligation on the part of this defendant to purchase any such plan."

The evidence introduced by both parties leaves much to be desired. However, there is no indication or contention that more definite evidence could be produced. Therefore, the court, in the consideration of the issues, has attempted to consider all of the testimony and to arrive at a reasonable solution of the controversy between the parties. In so approaching the case, the court realizes that it should not assume any facts that are not established by the evidence, but must consider the evidence in totality in order to determine what the intention of the parties was and whether plaintiff is entitled to recover any amount and, if so, how much and on what basis.

The defendant corporation was organized February 16, 1959, and became the owner of real estate situated in Fort Smith, upon which it desired to erect a shopping center.

In the spring of 1960 the plaintiff was engaged in the mortgage loan brokerage and insurance business and during that time was employed by a group of physicians in Fort Smith to aid them in obtaining finances to construct a medical center in the city. Mr. Jewel Morris, a stockholder and the Vice President of the defendant corporation, learned of such activity on the part of the plaintiff and requested a conference with plaintiff. In accordance with such request the plaintiff met Messrs. Morris and Paul J. Bercher, Jr., who at the time was a stockholder, in Fort Smith, Arkansas, for a general conference. Accompanying the plaintiff was Mr. R. S. Sams, who at that time, but not presently so engaged, was an agent of the Great Southern Life Insurance Company. The discussion was along general lines, but Messrs. Morris and Bercher advised plaintiff that the defendant corporation desired to construct a shopping center and was interested in obtaining a loan from some institution with which to finance the construction. The plaintiff was requested to make suggestions, which he did, and Messrs. Morris and Bercher specifically inquired of him what he would expect as remuneration for his services in aiding the corporation if the corporation should desire to proceed. They were assured at the time by the plaintiff that he would not expect any

commission or compensation from them or the corporation for his work in aiding them in obtaining a loan, but that he would obtain his compensation in another manner. When asked to explain what he meant by that statement, he stated that he was not a broker and would "get his pay" from Great Southern Life Insurance Company. He also stated that he hoped to write insurance for the corporation and the individual stockholders, and that his commission as an insurance agent would be all that he would expect. At that time, but not at the time of the trial, he was a life insurance agent of the Great Southern Life Insurance Company. It was also ascertained by Messrs. Morris and Bercher at that time that the plaintiff was obtaining his compensation for the work he was doing for the group of physicians by writing insurance for them.

The plaintiff was introduced by Sams as a Vice President of the Great Southern Life Insurance Company, and Messrs. Morris and Bercher left the conference believing that the plaintiff was in fact a Vice President of the insurance company. He carried a business card, 3½ x 2 inches in size, which apparently was handed to either Mr. Morris or Mr. Bercher. However, they did not read the card but assumed that he was a Vice President of the insurance company and had appeared in such capacity. The other officers and stockholders of defendant entertained the same opinion until months later.

The card, enlarged to twice its size, is as follows:

First
Vice President

**BYRON G. DUNN**

Office Phone: MU 3-2226 300 Commercial National Bank Bldg.
Residence Phone: MU 7-6110 MUSKOGEE, OKLAHOMA

The next contact that the plaintiff had with any of the officials of the defendant corporation was on May 3, 1960, at which time he called on the defendant, Richard L. Martin, who was one of the directors of the defendant corporation. The next day, May 4, 1960, a special meeting of the Board of Directors of the defendant corporation was held. The minutes of the meeting reflect that Mr. Martin reported "on progress made toward securing a loan for construction of the shopping center. He stated that Byron Dunn, Agent for Great Southern Life Insurance Company of Houston, Texas, had conveyed the unofficial information that the company would commit itself to a loan in the amount of $350,000.00 at 6½ percent interest without a national or stockholder endorsement of the Consumer Market, Inc., lease to the shopping center and that he (Dunn) was of the opinion that he personally could obtain an additional $250,000.00 commit-

ment from an unnamed source who would enter into a mutually acceptable arrangement with Great Southern for the security on their respective loans."

Upon this report being made to the directors, they adopted a resolution providing:

" * * * That the president or vice-president is hereby authorized to borrow not in excess of $600,000.00 from the Great Southern Life Insurance Company and/or any other lending institution for such period and on such terms as may be agreed upon by the officer effecting such loan, provided, that such loan shall not exceed an interest rate equal to 6½% per annum of the amount borrowed and, provided further, that such lending institution shall not require personal endorsements in excess of the proportion each stockholder's share of stock in Phoenix Village, Inc. bears to the total outstanding shares of stock in the corporation, and

* * * * * *

" * * * That the president or vice-president is authorized to execute, in behalf of this corporation, such application for loan or loan agreement or other papers or documents as may be necessary or advisable in order to effect such loan or loans."

Following the meeting of the Board and on the same day, Mr. Martin wrote plaintiff as follows:

"You are authorized to negotiate with any lending institution of your choosing for a mortgage loan on certain land belonging to the corporation in the vicinity of Towson and Phoenix Avenues in Fort Smith, Arkansas. It is understood that any final arrangements made by virtue of such authority will be subject to approval of the board of directors of Phoenix Village, Inc. and that no liability will be incurred by the corporation until such approval is given and application made.

"The undersigned is a director of and attorney for Phoenix Village, Inc."

The letter was written at plaintiff's request to insure him a finder's fee from whichever of his unnamed sources he might secure the $250,000.00 over and above the $350,000.00 his company (Great Southern) would probably lend.

Following the receipt of that letter the plaintiff proceeded to acquire certain information which he thought necessary to include in an application for a mortgage loan, and on July 11, 1960, he personally prepared in his own handwriting an application of the defendant corporation to Great Southern Life Insurance Company for a first mortgage loan on city real estate. The application appears as plaintiff's Exhibit No. 2 and is for a loan of $600,000.00. Paragraph 11 of the application is entitled "Brokerage or Commission Agreement," and is as follows:

"Give name of any firm, corporation, or individual employed by you to procure this loan.

"NAME _____ None _____

"ADDRESS _____ None _____ PHONE NO. ___ None ___

"What amount, if any, have you agreed to pay for such services, Cash $ __ None __ Deferred payments $ _____ None _____

"Do you now agree that such person, firm, or corporation is acting as your agent and is not the agent of the Great Southern Life Insurance Company _____ None _____ Attach a copy of any loan or commission agreement you have respecting this loan."

At that time it was definitely understood by the plaintiff and the defendant, as well as the directors and stockholders of the defendant, that plaintiff would not expect to receive any compensation from the applicant for the loan if it was granted, but that he would receive his compensation either from the loaning agency or through insurance if the stockholders, officers and corporation were required to obtain insurance. There was no agreement at any time by anyone that they would take the insurance, but it was agreed that if the corporation or officers decided to take insurance, it would be procured through the plaintiff.

Evidence was introduced of only one formal meeting of the Board of Directors. That meeting occurred, as heretofore stated, on May 4, 1960, and the resolution adopted by the directors has heretofore been set forth.

No doubt the plaintiff met from time to time between May 4, 1960, and July 11, 1960, with individual officers and stockholders of the defendant, but it is impossible to determine what was discussed between plaintiff and the various stockholders and directors, or what was in fact done by anyone.

It appears certain that the directors of the defendant either collectively or singly concluded that it would be necessary to obtain the services of a leasing agent and an architect. Accordingly, a Mr. Robertson of Oklahoma City was contacted, and an agreement was entered into between the defendant and Robertson as leasing agent, and an architect recommended by the leasing agent was also employed by the defendant. Just when that action was taken does not appear from the evidence.

The plaintiff had spent some time in collecting information before he drafted the application on July 11, for a loan of $600,000.00 at 6½ percent. The application was executed by the President of the defendant and forwarded by the plaintiff to Great Southern Life Insurance Company. The testimony does not disclose when the application was received by Great Southern, but the court infers that it was received a few days after the date of the application, July 11, 1960. The court further infers from the testimony of the plaintiff that he was advised that the application of July 11, 1960, would not be accepted by Great Southern, and plaintiff contacted the Oklahoma Mortgage Company but apparently it was not interested. Also, he suggested to Great Southern that it consider a metes and bounds or partial loan but that suggestion was declined.

The application to the Oklahoma Mortgage Company, if one was submitted, was not introduced in evidence, and neither was any supplemental application to Great Southern introduced, but evidently a new application was submitted to Great Southern for a loan of $450,000.00 because the plaintiff forwarded a check for $4,500.00 as a standby fee in support of the application for a loan of $450,000.00.

A consideration of the testimony leads one to believe that the negotiations were more or less conducted in a haphazard fashion. No evidence was introduced explaining why the application of July 11 for a loan of $600,000.00 was not accepted, and the court is left more or less "in the dark" as to just what did occur. However, on November 16, 1960, four months and five days after the application of July 11 was submitted, Great Southern forwarded to the defendant a commitment for a loan of $450,000.00 with interest at 6 percent per annum.

The commitment was conditioned upon the requirement that portions of the completed improvements would be occupied by certain tenants named therein, and that the monthly rental from the listed proposed tenants would total $7,595.50.

A further condition was that "additional rental spaces being occupied by tenants acceptable to our company under leases with terms and conditions satisfactory to our company. The leases must be in effect at the time we disburse the proceeds of the loan." Also, the commitment required that year-round

air conditioning be installed in all rental spaces, and that disbursement would not be made until the improvements were inspected and accepted by representatives of the defendant, the tenants, and the insurance company.

That commitment provided that it would expire July 1, 1961. Apparently it was accepted shortly after its receipt and in accordance with the provision that it was required to be accepted "within 14 days of the date hereof."

In all probability the leasing agent, Mr. Robertson, was not employed by the defendant until the commitment was accepted.

In December 1960, while the commitment of November 16, 1960, was in force, Messrs. Martin, Holley and Morris, directors of the defendant, were furnished by plaintiff a plan for life insurance to be issued on the lives of the officers and stockholders. The first plan formulated by plaintiff called for the payment of a premium of $23,000 per year, and when that plan was declined, the plaintiff submitted another plan which called for the payment of a monthly premium of $1,-100.00 per month. No evidence was introduced showing the amount of the commissions plaintiff expected to receive under either plan.

Prior to the submission of the insurance plans by the plaintiff, some of the officers, apparently Mr. Martin, Mr. Holley and Mr. Hatfield and possibly one or two others, executed applications, but when the plans were submitted, the applications were either withdrawn or destroyed, and it was definitely determined that there would be no insurance program.

Apparently the next conference between the plaintiff and any of the directors or stockholders of defendant occurred February 21, 1961, before the expiration of the commitment of November 16, 1960. At that meeting the question of whether any insurance would be purchased was definitely discussed, and plaintiff agreed that the defendant and

its stockholers and officers were not obligated to buy insurance, but it was further agreed by those present that if any insurance program was adopted by the defendant that the plaintiff would be contacted and offered the business.

Prior to May 1, 1961, and apparently subsequent to February 21, 1961, the plaintiff assisted the defendant in obtaining an extension of the November 16, 1960, commitment, and another commitment, identical with the first commitment, was issued by Great Southern dated May 2, 1961, which by its terms was to expire October 1, 1961. This renewed commitment was accepted by the President of the defendant corporation on May 10, 1961. (Plaintiff's Exhibit No. 6.)

The testimony does not disclose whether any additional information or data was submitted to Great Southern prior to the issuance of the renewal of the commitment, or when the application for renewal was made. There was a great deal of dissatisfaction among the officers and stockholders of the corporation as to the terms of the commitment, particularly the provisions which required full fire insurance protection with extended coverage to be placed with companies satisfactory to Great Southern and to the requirement that the promissory note be endorsed personally by the present stockholders of the defendant, including H. J. Morris, Nita Morris, J. R. Morris, R. H. Gentry, Helen Gentry, Vernon Merrywell, Wendell Johnson, S. B. Holley, Charles Fite, and Wilson Hatfield, and any others who were stockholders at the time the proceeds of the loan were disbursed.

The corporation was also concerned about the provision that the proceeds of the loan would not be disbursed until the completed improvements "are inspected and accepted by representatives of Phoenix Village, Inc., the tenants and Great Southern Life Insurance Company." The plaintiff attempted to allay the expressed fears that the inspection would not be fair by representing that he would act for Great Southern and that he could

on occasions be very liberal in his inspections.

The officers and stockholders did not contemplate that any personal endorsement of the evidence of indebtedness would be required. In fact, at the formal meeting of the directors of the defendant on May 4, 1960, Mr. Martin, the attorney for defendant, reported that Mr. Dunn, "Agent for Great Southern Life Insurance Company of Houston, Texas, had conveyed the unofficial information that the company would commit itself to a loan in the amount of $350,000.00 at 6½ percent interest without a national or stockholder endorsement of the Consumer Market, Inc., lease to the shopping center and that he (Dunn) was of the opinion that he personally could obtain an additional $250,000.00 commitment from an unnamed source who would enter into a mutually acceptable arrangement with Great Southern for the security on the respective loans."

The defendant, its officers and stockholders obtained interim financing from a local institution and evidently exhibited the commitment from Great Southern, but again the evidence does not show when the interim financing was obtained. However, after the interim financing had been arranged, construction was begun by the defendant. Again the court is compelled to infer that construction had begun when the defendant consulted its leasing agent and applied to Jefferson Standard Life Insurance Company for a loan of $500,000.00 with interest at 6 percent without the requirement of individual endorsements of the officers and stockholders. The application was granted in the sum applied for, and the money was disbursed and used by the defendant in the construction of the shopping center. However, the evidence does not disclose when the application to Jefferson Standard was made nor when a commitment was made by it or, in fact, when the loan was consummated.

The court is of the opinion, based upon the discussions at the conference of February 21, 1961, hereinbefore referred to, that the plaintiff became convinced that the defendant would not enter into any insurance program, and that if he obtained any compensation for the work, he would have to assert that he did the work under an express contract to the effect that the defendant, its officers and stockholders agreed to pay him 3 percent of the amount of the loan, plus expenses. Soon after the meeting of February 21, 1961, he advised Mr. Richard L. Martin, the attorney for defendant, that he would accept $15,500.00 for an immediate settlement. In a letter dated March 1, 1961, in response to the offer, Mr. Martin stated:

"I have been instructed to inform you that, after a full discussion, it was the unanimous opinion of the directors that further consideration of a stock redemption program for the company, insurance funded or otherwise, be suspended for the time being. If and when such a program is deemed feasible, the directors or their duly authorized representatives will contact you in accordance with the original understanding between you and the company."

It will be remembered that the defendant has contended at all times that the only compensation the plaintiff was to receive would be derived from an insurance program if such a program should be adopted by the defendant.

Without doubt the only discussion relative to compensation that occurred between the plaintiff and the defendant, or any of its representatives, was in connection with the proposed insurance program. The defendant did not agree to pay a commission of 3 percent or any other sum as a commission.

The plaintiff now contends that he should recover 3 percent of $450,000.00 as a commission, plus expenses of $3,-112.00. He filed an itemized statement of the expenses which he claimed he had incurred. There was no corroboration of any kind that he had actually incurred expenses in the amount claimed by him, and the court is of the opinion that he did not incur expenses in the sum claimed. For instance, he claimed that

he had expended $1,235.00 for long distance telephone, $185.00 for lodging, $800.00 for traveling expenses, and $792.00 for credit reports together with $100.00, which he designated as "Great Southern billing." It should be remembered that during most of this time he was engaged in the insurance business and work for the group of physicians who were constructing the medical arts center in Fort Smith. The court feels that he may have incurred some expenses, but most of the trips that he made to Fort Smith were made in connection with other employment. If he had incurred the expenses claimed by him, he could have submitted some corrobating evidence.

He also contends that he obtained the interim financing for the defendant, but the court is of the opinion that even though he may have discussed the matter with the president of the First National Bank of Fort Smith, the interim financing was in fact obtained by the defendant and its officers and stockholders.

At all times material herein the plaintiff was a citizen and resident of the State of Oklahoma, and while he was a life insurance agent of Great Southern in the State of Oklahoma, he had not been licensed to solicit, accept applications, or to sell life insurance or any other kind of insurance in Arkansas. On his brief he does not seriously contend that he should have been permitted to write the life insurance for the defendant corporation and its officers and stockholders, but he alleged in his amended complaint that he was to be paid a broker's fee of 3 percent of the amount stated in the commitment issued by Great Southern, or compensated "by permitting him to write life insurance on the lives of the individual defendants to be owned by the corporation in the amount of the capitalized structure of the shopping center."

The Arkansas Insurance Code, Acts 1959, No. 148, became effective March 3, 1959. Section 152 of the Act now appears in Ark.Stat.Ann., Sec. 66–2809 (1961 Supp.), and reads as follows:

"(1) No person shall in this State act as or hold himself out to be an agent, broker, or solicitor, as to subjects of insurance located, resident or to be performed in this State, or receive compensation for obtaining insurance, unless then licensed therefor pursuant to this chapter.

"(2) No agent, broker, or solicitor shall solicit or take application for, procure, or place for others any kind of insurance as to which he is not then licensed. * * * *"

As to the qualifications requisite for obtaining a license, see Sec. 66–2811.

"Failure to secure a license or certificate of authority to act as an insurance agent precludes recovery of commissions where a valid statute expressly provides that no compensation shall be paid until a certificate has been obtained, and in some jurisdictions, failure to procure the required license has been held to preclude the recovery of commissions on business done while so unlicensed, even though the statutes do not expressly stipulate against such a recovery." 29 Am.Jur., Insurance, Sec. 171.

 Any contract entered into by an unlicensed agent is void and unenforceable even though the statute does not expressly declare such contracts to be void. Such statutes are adopted as a matter of public policy to further the public interest and their benefits cannot be waived. 53 C.J.S. Licenses § 59.

 Such statutes are constitutional. 44 C.J.S. Insurance § 85.

 The acceptance by the person solicited does not render the contract providing for compensation enforceable. Sherwood v. Wise, (1925) 132 Wash. 295, 232 P. 309, 42 A.L.R. 1219. See, also, annotation beginning at page 1226 of 42 A.L.R.

In 16 Appleman, Insurance Law and Practice, (1944) Sec. 8971, beginning at page 471 the rule is stated as follows:

"An unlicensed agent cannot recover the agreed compensation for services performed by him. Whether such person acts as agent or broker would be immaterial as to the procuring of insurance as he cannot recover compensation for services performed while unlicensed."

In footnote 3, the author states:

"The topic of insurance brokers is so clearly allied to that of real estate brokers that cases under one of such topics are pertinent to the other."

See, Howard v. Bean, (1931) 275 Mass. 115, 175 N.E. 295.

The Supreme Court of Arkansas has not had an occasion to determine whether an unlicensed insurance agent or broker may recover compensation for insurance solicited by him, but the court has considered the statute which requires the licensing of real estate brokers. The Real Estate Brokers Act, Acts 1929, No. 148, appears in Ark.Stat. Ann. as Secs. 71–1301—1311. Section 1 of the Act (71–1301) provides a penalty for engaging in the real estate broker business without a license. The last paragraph in Section 2 of the Act (71–1302) provides:

"No recovery may be had by any broker or salesman in any court in this State on a suit to collect a commission due him unless he is licensed under the provisions of this Act, and unless such fact is stated in his complaint."

In Birnbach v. Kirspel, (1934) 188 Ark. 792, 67 S.W.2d 730, the court at page 796 of 188 Ark., at page 732 of 67 S.W.2d said:

"Under the provisions of this statute a salesman without license cannot recover any commission. However, this court, long before the passage of act No. 148, stated: 'The law is well established that where a statute prohibits engaging in a business or calling without having procured a required license, or where it expressly vitiates all contracts made by unlicensed persons while engaged in such business or calling, a contract made by one who has no license is invalid, and cannot be enforced.' Stiewel v. Lally, 89 Ark. 195, 115 S.W. 1134."

The holding has been reaffirmed in many subsequent cases, Nelson v. Stolz, (1939) 197 Ark. 1053, 127 S.W.2d 138; Bridwell v. Davis, (1943) 206 Ark. 445, 175 S.W.2d 992; Savo v. Miller, (1955) 224 Ark. 799, 276 S.W.2d 67.

■ Therefore, even though the president of the defendant corporation, S. B. Holley, did execute an application on behalf of the corporation, as well as his individual application for insurance along with certain other officers and stockholders, the plaintiff lost nothing by the failure of the defendant corporation to go forward with the proposed insurance program.

Following the meeting of February 21, 1961, which was an informal meeting but at which the plaintiff became convinced that there would be no insurance program in the immediate future, the plaintiff suggested that while Great Southern had waived the occupancy clause in the medical arts center loan, that if he didn't get insurance on the stockholders in Phoenix Village by the time the loan was ready for closing, that Great Southern might not waive the 100-percent occupancy clause in its commitment. The action of the plaintiff following that meeting was such that caused the defendant corporation to seek a loan from the Jefferson Standard Life Insurance Company.

As heretofore pointed out, the plaintiff alleged in his original complaint that during the period from on or about April 15, 1960, to on or about October 1, 1961, he performed services as requested of him by the defendant, including but not limited to the preparation of financial statements, the securing of a leasing agent, the preparation of loan applications, the securing of adequate interim financing, and the securing of loan commitments for permanent financing. That the defendant accepted his services with

the knowledge that they were being rendered with the expectation on the part of the plaintiff of receiving payment therefor, and that the defendant knew that such services were not gratuitous. The prayer of the original complaint is that plaintiff recover judgment against the defendant "for the reasonable value of his services."

■ Implied contracts are classified as contracts implied in fact and contracts implied in law. It is a misnomer to designate a contract implied in law as an implied contract, but the term "implied contracts" as it is ordinarily employed is broad enough to include both contracts implied in fact and quasi or constructive contracts. 17 C.J.S. Contracts § 4, p. 317.

■ If there was an express contract, as the plaintiff alleged in his amended complaint and testified at the trial, he would be required to base his claim upon the express contract and not upon any implied contract. "The law never accommodates a party with an implied contract when he has made a specific one as to the same subject matter." Jackson v. Jones, (1860) 22 Ark. 158, 161.

"There can be no implied contract where there is an express contract between the parties in reference to the same subject matter." 17 C.J.S. Contracts § 5, p. 321.

In Verdi v. Helper State Bank, (1921) 57 Utah 502, 196 P. 225, 229, 15 A.L.R. 641, the court at page 647 of 15 A.L.R. said:

"The complaint was predicated upon an express contract to pay interest and not upon an implied one. It is axiomatic that where an express contract exists, one may not be implied. 2 Elliott, Contracts § 1360; 9 Cyc. 242. Ordinarily, therefore, where the plaintiff seeks to recover upon an express contract he cannot rely upon an implied one."

See, also, Cochran v. Zachery, 137 Iowa 585, 115 N.W. 486, 16 L.R.A.,N.S., 235, 126 Am.St.Rep. 307.

In 12 Am.Jur., Contracts, Sec. 7, page 505, the rule is stated as follows:

"There cannot be an express and an implied contract for the same thing existing at the same time. It is only when parties do not expressly agree that the law interposes and raises a promise. No agreement can be implied where there is an express one existing."

In Section 4, page 498, 12 Am.Jur., Contracts, it is stated:

"Contracts are express or implied. Implied contracts are implied in fact or in law. Contracts are express when their terms are stated by the parties. They are often said to be implied when their terms are not so stated. Contracts implied in fact are inferred from the facts and circumstances of the case, and are not formally or explicitly stated in words. It is often said that the only difference between an express contract and a contract implied in fact is that in the former the parties arrive at their agreement by words, whether oral or written, sealed or unsealed, while in the latter, their agreement is arrived at by a consideration of their acts and conduct, and that in both of these cases there is, in fact, a contract existing between the parties, the only difference being in the character of evidence necessary to establish it. In other words, in an express contract all the terms and conditions are expressed between the parties, while in an implied contract, some one or more of the terms and conditions are implied from the conduct of the parties. The source of the obligation of express contracts and contracts implied in fact is the manifested intention of the parties. An implied contract between two parties is only raised when the facts are such that an intent may fairly be inferred on their part to make such a contract. All the pertinent circumstances must be taken into consideration.

"A promise will not be implied where an express promise would be contrary to law and is forbidden."

H. B. Hackleman, the Regional Manager for Great Southern, with offices in Tulsa, Oklahoma was produced as a witness by plaintiff. Hackleman testified that he also worked as a mortgage loan broker and was paid in one of three ways —by cash fee or commission, stock in enterprise, or by sale of life insurance, but that it was customary in the brokerage profession to obtain a written contract and that he always did on any agreement made wherein he was to receive compensation for his services.

In Ward v. United States, (8 Cir.1946) 158 F.2d 499, the court, beginning at page 502, said:

"'* * * a promise to pay for services can only be implied when the court can see that they were rendered in such circumstances as authorized the party performing to entertain a reasonable expectation of their payment by the party benefited.' Coleman v. United States, 152 U.S. 96, 99, 14 S.Ct. 473, 474, 38 L.Ed. 368. See, also, Harley v. United States, 198 U.S. 229, 234, 25 S.Ct. 634, 49 L.Ed. 1029. An implied contract is an actual agreement, circumstantially proved. The facts relied upon to establish the agreement will not suffice if entirely consistent with the hypothesis that no such agreement existed. That is the situation here. Ward's efforts to get additional compensation or to be reassigned to his original duties while still in the Navy indicate that he did not expect additional pay unless he was able to secure some change in his status."

Osier v. Hobbs, (1878) 33 Ark. 215, was an action brought by appellee, Hobbs, to recover compensation for care and attention bestowed by the wife of Hobbs upon the child of appellant. The testimony showed that the child, which was feeble and sickly and very young, was given by appellant Osier's wife to Mrs. Hobbs to be raised. At that time Mrs. Osier was in a dying condition, and Mrs. Hobbs, wife of appellee, took the child and kept it more than two years, rendering it fair motherly attention. During that period appellant Osier did many acts of neighborly kindness to the Hobbs family. He sent them provisions, furnished teams, etc. Neither party intended to charge for services to the child on the one hand, or for articles or labor furnished on the other. The case was tried to the court without a jury and the appellant Osier requested the court to declare the law to be:

"'First—If the plaintiff and wife, at the time the child was taken to their house to be raised, and during its continuance there, did not intend to charge for board and attention rendered to it, he has no cause of action in the case.

"'Second—If it was understood by and between plaintiff and his wife, and the defendant, during the time the child was at their house, that no charge was to be made against the defendant for board and attention to the child, the plaintiff cannot, afterwards, claim compensation and maintain this action.'"

The trial court refused to declare the law to be as requested, but on the other hand held that "the defendant is liable to plaintiff for a reasonable compensation for the care of the infant of said defendant, less the value of the contributions made by the defendant." The trial court based that finding and conclusion on the ground that defendant permitted the wife of plaintiff Hobbs to receive his child, an infant, under the belief that the plaintiff's wife was to have the child and raise and care for it as her own, and permitted her to have the care and charge thereof for two years and six months; that the defendant appellant had made sundry advancements or contributions of provisions, medicines and clothing, amounting to $175.00, towards the support of the child, "neither party intending to charge the other for these favors," and the defendant afterwards took the

child away against the assent of the plaintiff.

In reversing the case, the court said at page 217:

"The general principle is well announced in the instructions asked; that, services intended at the time to be gratuitous, cannot, afterwards, be used to raise an implied contract to pay for them; and this was the case made by the paper filed before the Magistrate. It was a simple account against Wm. J. Osier, in favor of Isaac Hobbs, for 'board, attention and care' of the child, at the request of the defendant, from June 16th, 1872, to August 1st, 1874, $300. According to the findings of the court in this action, the declarations of law asked by defendants should have been given, and the judgment should have been in his favor."

In Brown v. Wyandotte & Southeastern Ry. Co., (1900) 68 Ark. 134, 56 S.W. 862, the court at page 146 of 68 Ark., at page 865 of 56 S.W. said:

"It appears to us that there is no error in refusing to allow Brown damages for terminal facilities at Gifford, for it seems he did not intend or expect to charge for them at the time they were allowed Hamlin & Son. Having granted the privilege of terminal facilities without intention of charging for them, he could not afterwards change his mind and charge for them. Osier v. Hobbs, 33 Ark. 215; Cantrell v. Clark Co., 47 Ark. 239, 1 S.W. 200."

█ It is difficult to understand just what the relationship was between the defendant corporation and the plaintiff. The various conferences between plaintiff and some of the stockholders and directors of the defendant corporation clearly establish that there was no express contract entered into between the defendant corporation and plaintiff. It is perfectly clear that the plaintiff at the beginning did not expect the corporation to pay him a fee for any work that he might do in obtaining a loan. It was clearly understood that any compensation that he might receive for his assistance would be paid by the lender. At no time was it contemplated that the defendant corporation would be required to pay a commission or fee on the amount of any loan. However, there is no doubt but that the plaintiff had in mind and hoped to sell to the corporation, its directors and stockholders an insurance program, and that his commission on the insurance premiums would amply compensate him for any time and effort expended in assisting the corporation to obtain a loan for the construction of the shopping center. It was only after the plaintiff ascertained that under the law of Arkansas he could not solicit and collect a commission for writing insurance, since he was not licensed, that he realized that it would be necessary for him to claim that the corporation agreed to pay him a fixed fee for his services in obtaining a loan commitment. As heretofore stated, no such contract was entered into at any time nor was it ever mentioned by anyone, and the contention of plaintiff that there was an express contract to pay a fee of 3 percent, as alleged in the amendment to the complaint, is purely an afterthought. When all of the facts and circumstances and the relationship between the parties are considered, the court is compelled to hold that no such agreement existed.

This leaves for consideration and determination whether, under the facts, the law imposes an obligation upon the defendant corporation without regard to its assent.

█ Quasi or constructive contracts (commonly referred to as contracts implied in law) are obligations which are imposed or created by law without regard to the assent of the party bound, "on the ground that they are dictated by reason and justice, and which are allowed to be enforced by an action ex contractu. They rest solely on a legal fiction and are not contract obligations at all in the true sense, for there is no agreement; but they are clothed with the semblance of contract for the purpose of

the remedy, and the obligation arises not from consent, as in the case of true contracts, but from the law or natural equity. Such contracts rest on the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another, and on the principle that whatsoever it is certain that a man ought to do, that the law supposes him to have promised to do." 17 C.J.S. Contracts § 6, p. 322.

 Where a party has in good faith rendered a service, not illegal or contrary to public policy, and the other party has accepted and used the service, the former may recover. In other words, if the performance is accepted and used by the other party, such party is answerable to the amount whereby he has benefited. The basis of liability under a quasi or constructive contract is the benefit conferred upon a defendant, and not the detriment incurred by the plaintiff. However, there is no general rule to the effect that the law implies a promise to pay irrespective of the circumstances under which the benefit was conferred.

"What seems to be a more precise statement of the rule is that no claim in the nature of a quantum meruit can be founded upon a special contract which has not been performed unless the person who has the right to insist upon the performance of the special contract has accepted some benefit resulting from its partial performance or the circumstances are such as to show in some other way that a new contract has arisen between the parties. The mere fact that a part performance has been beneficial is not enough to render the party benefited liable to pay for the advantage. It must appear that he has taken the benefit under circumstances sufficient to raise an implied promise to pay for the work done, notwithstanding the nonperformance of the special contract. The acceptance of the benefit of a partial performance or of performance in a way different from that contracted for, where the party has the option of returning or rejecting the consideration performed, will usually be sufficient to imply a promise to pay a compensation commensurate with the benefit accepted. * * * The promise upon which the plaintiff recovers, however, is not the express promise of the contract, but the implied obligation arising from the acceptance of the benefit. Similarly, where the owner of land accepts the benefit of part performance of a contract to dig a well, he is liable to pay the value of such performance; but he is not liable therefor where he does not so accept." 12 Am.Jur., Contracts, Sec. 352.

 Literally translated, the words "quantum meruit" mean "as much as he deserved" or "as much as he deserves," and is the reasonable value to be given for the services performed. Thus, the basis of a recovery on a quantum meruit claim is that the defendant has received a benefit from the plaintiff which it is unjust for the defendant to retain without paying for it.

In Carpenter v. Josey Oil Co., (8 Cir. 1928) 26 F.2d 442, the court, beginning at the bottom of page 443, said:

"Quantum meruit refers to that class of obligations imposed by law, without regard to the intention or assent of the parties bound, for reasons dictated by reason and justice. The form of the action is contract, but they are not contracts, because the parties do not fix the terms and their intentions are disregarded. One class of such cases is those where a party wrongfully compels another to render him valuable services, and a promise to pay is implied, because on equitable grounds one ought not to be permitted to keep that which is received without compensation."

It will be remembered that the only formal action taken by the defendant corporation relative to obtaining a loan was that taken by the Board of Directors.

on May 4, 1960, based upon a report made to the Board by Richard L. Martin, a director and the attorney for the corporation, in which he reported that the plaintiff, "Agent for Great Southern Life Insurance," had unofficially advised that the company would commit itself to a loan in the amount of $350,000.00 and that the plaintiff was of the opinion that he personally could obtain an additional $250,000.00 from an unnamed source. In the resolution adopted by the Board of Directors on that date, the president or vice-president was authorized to borrow not in excess of $600,000.00 from Great Southern Life or any other lending institution, provided, "that such loan shall not exceed an interest rate of 6½% of the amount borrowed and, provided further, that such lending institution shall not require personal endorsements in excess of the proportion each stockholder's share of stock in Phoenix Village, Inc. bears to the total outstanding shares of stock in the corporation." The claim of plaintiff for compensation is based upon the commitment that was issued for $450,000.00. Any other efforts that the plaintiff may have made to obtain a commitment for an additional amount from some other lending institution were not successful. Time was passing and the defendant corporation was anxious to proceed with the construction of the shopping center. In order to begin construction it was necessary to obtain finances, and while the plaintiff contends that he assisted in obtaining interim financing, such financing was not obtained until the directors of the defendant corporation executed a promissory note to the local bank that furnished the interim financing. The testimony is not clear as to whether the commitment of Great Southern was then in force, but the court infers from the testimony that the commitment was in force; however, in order to obtain the interim financing the directors were required to secure the payment thereof by their personal endorsement or guarantee.

The evidence does not show any activity by plaintiff after the interim financing was obtained by the Board of Directors, except the insistence upon payment to him of a fee for the services that he had rendered. He indicated in various conversations with members of the Board of Directors that if he were paid, he would be in a better position to obtain favorable acceptance by Great Southern of the security which the defendant would ultimately execute to secure the disbursement of the loan.

It became apparent that the plaintiff could not obtain commitments for an additional sum from any other lending agency. The defendant was badly in need of funds. Construction had begun with money borrowed by the Board of Directors from a local institution. The loan from Great Southern could not be utilized without procuring additional loans. Fortunately for the defendant, it was able to procure from Jefferson Standard a loan of $500,000.00 at 6 percent interest, without personal guarantees being executed by members of the Board of Directors and other stockholders.

Thus, the ultimate question is what benefits did the defendant corporation receive and use as a result of the efforts of the plaintiff. The liability, if any, of the defendant must be based upon the accepted and used benefits and not upon any detriment incurred by the plaintiff.

Plaintiff has cited the case of Tallman v. Lewis, (1916) 124 Ark. 6, 186 S.W. 296, and quoted from page 11 of 124 Ark., page 298 of 186 S.W. as follows:

"* * * There is a distinction to be made between a contract which is illegal because its execution requires the performance of an immoral or unlawful act, or transgresses an express statutory prohibition, and one wherein the act to be performed is lawful, but the contract is invalid upon the grounds of public policy alone."

Plaintiff also cites and relies upon the case of Massachusetts Mutual Life Ins. Co. v. George & Co., (8 Cir.1945) 148 F.2d 42, in support of his contention that since the defendant accepted the

commitment of Great Southern for the loan of $450,000.00; that the commitment was outstanding when the interim financing was obtained from a local bank, and that it became liable to him for the value of his services in obtaining the commitment so accepted and utilized in obtaining interim financing.

Both cases, Tallman and Massachusetts Mutual Life Ins. Co., grew out of a specific contractual relationship that had been entered into by the parties. The contract in the Massachusetts Mutual Life Ins. Co. case was not in itself complete, while the contract involved in Tallman was invalid as being expressly prohibited by law.

In the instant case the plaintiff first alleged in his original complaint that he "performed services as requested of him by the defendants" and as a result of his efforts "commitments were secured from lending agencies which were accepted by defendants in the sum of $450,000.00," that the services were accepted "with the knowledge that they were being rendered * * * with the expectation on the part of the plaintiff of receiving payment therefor." He then prayed that he recover judgment "for the reasonable value of his services in the amount of $25,000.00 and his costs herein expended." In the amended complaint he abandoned his claim as alleged in the original complaint, and alleged that the agreement between himself and the defendant was an oral agreement, "and the defendants agreed to pay a broker's fee of three (3%) percent, plus expenses, of the amount actually borrowed, or to compensate the plaintiff by permitting him to write life insurance on the lives of the individual defendants, to be owned by the corporation, in the amount of the capitalized structure of the shopping center, and to further permit said plaintiff to place all property insurance on the structure to be built."

From the first contact and conference on April 4, 1960, between plaintiff, accompanied by R. S. Sams, a soliciting agent of Great Southern, and Messrs. Morris and Bercher, stockholders of defendant, it is apparent that his chief purpose was to create a favorable impression and then place himself in a preferred position to write any and all insurance that might be required by any institution that made a loan for the construction of the shopping center. The efforts put forth by him were primarily for accomplishing that purpose. He had no intention whatsoever of charging or expecting a flat fee for such efforts as he made to obtain a loan. Had he had any such intention, he would have obtained a definite contract as was and is the custom in such cases.

In Blake v. Scott, (1909) 92 Ark. 46, 121 S.W. 1054, 123 S.W. 1181, the court at page 50 of 92 Ark., at page 1055 of 121 S.W. said:

> "When a contract is entered into, it is either express in its terms or its terms may be implied from the acts, conduct, and express words of the contract. To form the agreement of the parties it is essential that there should be a distinct intention that is common to both. But the intention of the parties need not be express. It may be implied from the acts and words used, and the law will impute to the parties an intention which the meaning of their words and acts reasonably import."

In the instant case the evidence does not establish any agreement between the plaintiff and the defendant of a distinct intention that the defendant would pay plaintiff for whatever work he might perform in aiding the defendant to obtain and consummate a loan. The plaintiff, in his own handwriting in the application of July 11, 1960, for a loan of $600,000.00, which the plaintiff prepared, stated in no uncertain terms that the defendant had not agreed to pay a brokerage fee in any amount.

It is not the province of a court to alter or make a new contract for the parties. The court cannot supply by interpretation or otherwise material stipulations or interpret the action of the par-

ties so as to make a valid contract where they have not taken the precaution to do so.

Mr. Hackleman, a witness produced by plaintiff, testified that the customary brokerage fee for obtaining a loan varied from one to three percent of the amount of the loan, and the plaintiff has asked this court to determine the amount he should recover and to render judgment for him in such an amount.

The court is of the opinion that the plaintiff did not render any service to defendant which it was able to use or did use to its advantage, and after a thorough consideration of all the facts and circumstances, the court is of the opinion that he is not entitled to recover upon any of the contentions made by him, and judgment is being entered today, dismissing the complaint and the amended complaint and adjudging costs against the plaintiff.