C. A. SPRAGINS and Olivia Spragins, Plaintiffs,

v.

HUBER FARM SERVICE, INC., et al., Defendants.

Martha VEAL, a/k/a Martha Veal Byrnes, Plaintiff,

v.

HUBER FARM SERVICE, INC., et al., Defendants.

Nos. GC 80–194–WK–O, GC 80–215–WK–O.

United States District Court, N. D. Mississippi, Greenville Division.

Jan. 13, 1982.

49. Transcript (I), p. 118.

Frank S. Thackston, Jr., Greenville, Miss., for plaintiffs.

Philip Mansour, Greenville, Miss., Dan W. Webb, Oxford, Miss., for defendants.

## MEMORANDUM ORDER

KEADY, Chief Judge.

In these consolidated diversity actions, two defendants, Hans and Josef Huber, both of whom are Swiss nationals, have petitioned the court for an order disqualifying the law firm of Lake, Tindall, Hunger and Thackston (Lake, Tindall) from representing plaintiffs herein because of alleged conflict of interest arising out of the attorneys' prior professional relations with the Hubers. Lake, Tindall, through separate counsel, challenges the petition and asserts that there is no basis for disqualification. The court held a hearing on the petition on November 24, 1981, at which Lake, Tindall, its counsel, and counsel for petitioners appeared, argued the issues, and submitted documentary evidence in support of their positions. The court now embarks on the "painstaking factual analysis" required under applicable law. *See Duncan v. Merrill Lynch, Pierce, Fenner & Smith*, 646 F.2d 1020, 1021 (5 Cir. 1981).

## I.

In August 1977, Vivian Reed, a client of Lake, Tindall's partner Charles S. Tindall, went to Tindall's law office at Greenville, Mississippi, with Josef Huber (Josef) and Kay Taylor (Taylor) to discuss a sale of Forkland Plantation by Reed and her daughter to Huber Farm Service, Inc., a Tennessee corporation (Tennessee Huber), in which Hans and Josef Huber had a financial interest. Tennessee Huber was represented throughout the real estate transaction by separate counsel. A sales contract was signed by Reed and Josef, acting as secretary of Tennessee Huber, on August 24, 1977. A term of the contract recognized that Chester Kellems, Forkland's tenant in possession, had first right of refusal to purchase the property on the same terms as provided by the sales agreement with Tennessee Huber. When Kellems timely exercised his option, Taylor protested to Reed that Kellems was purchasing Forkland not for himself but for Felix Bibus, the party to whom Tennessee Huber expected to sell the property. Tindall advised Taylor and Tennessee Huber's counsel that the Reeds would nonetheless honor their agreement with Kellems. In October, Taylor presented Reed with a backdated agreement which purported to confirm that Reed had employed Taylor to act as broker with regard to the sale of the Forkland property. Reed denied that any such agreement had been reached and, acting with Tindall's advice, refused to sign the document. On October 17, Josef and Hans Huber, accompanied by Memphis counsel, went to Tindall's office to discuss Kellems' exercise of his purchase right. Tindall presented documentary evidence that Kellems had acted within his rights, and it was then understood that the Hubers had no complaint with the Reed family.

On October 27, 1977, against this background of events, Taylor and either Hans or Josef Huber consulted with Frank W. Hunger, another Lake, Tindall partner, concerning formation of a Mississippi corporation under the name of Huber Farm Service of Greenville, Inc. (Mississippi Huber). Lake, Tindall had not previously represented Taylor or the Hubers. Aware of the fact that Tindall was actively representing Reed in her property transactions with the Hubers, Hunger immediately called on Tindall to discuss the possibility of a conflict of interest. Tindall and Hunger both discussed the matter with Taylor and Hans or Josef. Tindall stated that he understood from previous conversations with Huber and counsel that the Hubers had no complaint against the Reeds, which fact Huber acknowledged to be true. Tindall further explained that the firm was obligated to represent Reed's interests. Upon the understanding that there was no present dispute between Huber and the Reeds, and that if a controversy did arise the firm would continue to represent Reed and terminate its relationship with the Hubers, Lake, Tindall agreed to

assist in the formation of the Mississippi corporation.

Pursuant to her request, Hunger advised Taylor as to ownership of land by nonresident aliens under Mississippi law. He then prepared a corporate charter, bylaws, and minutes of organizational meeting for Mississippi Huber, the principal purpose of which was to buy, sell, own, lease, and operate farm lands. Taylor was to be Mississippi Huber's resident agent in Greenville. The capital stock was to be closely held between Tennessee Huber and Taylor, with 65% going to Tennessee Huber and 35% held by Taylor. Of the 500 shares of authorized capital stock, 26 shares were subscribed to Josef and 14 to Taylor. As predetermined, Josef, Hans, and Taylor were company directors, with Josef acting as president, Taylor vice-president, and Hans secretary and treasurer. The corporate organization was completed on January 2, 1978, by the election of directors and officers and adoption of a standard set of bylaws and appropriate resolutions opening a local bank account and granting officers managerial authority in all company matters. Hunger also acted for Taylor in securing a lease on a local business office.

On January 30, 1978, Hunger submitted Taylor his bill for professional services in the amount of $900 (18 hours at $50 per hour) plus expenses of $211.58, which bill was paid by Taylor. This ended the professional relationship between Hunger and the Hubers, Taylor, and Mississippi Huber. In fact, Hunger, in late December 1977, advised Taylor that the firm should withdraw from representation of Mississippi Huber and its owners because of controversy brewing between the Hubers and Taylor and the Reeds. Hans, Josef, and Taylor stated that they understood the problem and thanked Hunger for his help. At the time of termination, Hunger had performed no professional service for Mississippi Huber as a functioning corporation, nor had he represented Mississippi Huber, Taylor or the Hubers in any farm land transactions.

The law firm was first put on notice of a controversy regarding the Forkland property on December 17, 1977, when Reed advised Tindall that she had been served with process in an action filed in the chancery court of Washington County, Mississippi, by Tennessee Huber against the Reeds, Kellems, and others seeking specific performance of the sales contract of Forkland Plantation. On December 28, the Reed family consummated the sale of Forkland to Kellems as provided in their lease contract. Tindall continued to represent Reed with regard to the litigation. Kellems and his transferees were represented by independent counsel who first raised as a defense that Tennessee Huber, as a foreign corporation not qualified to do business in Mississippi, could not maintain the action in state courts. Discovery depositions were taken of Josef, Hans, and Taylor regarding their relationships with Tennessee Huber. Disclosures by Hans, in his March 2, 1978 deposition, revealed for the first time a business relationship between Huber Treuhand, A.G., a Swiss corporation, and Tennessee Huber, and the promotion of their real estate transactions in Mississippi through the Hubers and Taylor. Adopting positions first urged by other defendants, the Reeds, through Tindall, expanded the disqualification defense to include the allegation that the Swiss corporation was alter ego of or joint venturer with Tennessee Huber in the Forkland transaction.

Tennessee Huber nonsuited the litigation when it came to trial in June 1978. A second lawsuit alleging the same cause of action was likewise terminated. In July 1978, a similar federal complaint was filed by Tennessee Huber against the Reeds and Kellems and his transferees. Tindall again asserted the defense that Tennessee Huber was illegally doing business in Mississippi and engaged in such business in a joint venture with or alter ego of the Swiss corporation. The federal action was dismissed with agreement of the parties, and the controversy between Reed and the Hubers apparently ended in November 1978.

Subsequently, however, a dispute arose between Mississippi Huber and Taylor and the present plaintiffs, during which many

of the issues raised in the Reed litigation again surfaced. In the summer of 1978, C. A. Spragins, Sr., and his children, Allen Spragins, Martha Veal, Ruth Cranston and her husband Dr. Philip Cranston, listed four Arkansas farm properties for sale with Taylor and her company, Dough Boy, Inc., as broker. In consolidated state court actions, Taylor asserted that she was in fact purchaser of the properties and had assigned her interest in the sales contracts to Mississippi Huber. The Spragins interests, all of whom were ultimately represented by Lake, Tindall,[1] refused to close the sale of one of the four Arkansas farmlands, and Taylor and Mississippi Huber, as plaintiffs, sought specific performance on that sales contract. During discovery depositions, Taylor acknowledged that she held a one-third interest in Mississippi Huber, was a director, and served as vice-president. On appeal to the Mississippi Supreme Court, it was held that Taylor had breached a fiduciary duty to the Spragins by not disclosing her principals and by attempting to make a secret profit for herself and Mississippi Huber. Accordingly, the request for specific performance and damages with regard to the breach of contract asserted by Taylor and Mississippi Huber was denied. *Spragins v. Louise Plantation, Inc.,* 391 So.2d 97 (Miss.1980). In this vigorously contested lawsuit, neither Taylor nor Mississippi Huber raised any objection to Lake, Tindall representing the Spragins' interests.

The actions sub judice were filed against Tennessee Huber, Hans, Josef, and Huber Treuhand, A.G., three months prior to the time the state supreme court made its ruling, and involve the three Arkansas properties not included in the state court litigation, but raise closely related issues. In these actions, C. A. Spragins, Sr., his wife Olivia and daughter Martha Veal, claim that Taylor breached fiduciary duties owed to them by not disclosing that she was acting as agent for defendants, who later sold the properties to third persons at a profit, and that defendants, as undisclosed principals, are liable for Taylor's allegedly fraudulent representations by their approval of and acquiescence in her conduct. Plaintiffs sue for recovery of commissions paid Taylor and for lost profits. Alternatively, plaintiffs claim that Taylor was not qualified to act as a real estate broker and that the sales agreement was illegal, thereby entitling them to recover from defendants the sums demanded. Thus, the only difference between the prior Spragins state court litigation and the present federal actions is that in the former the Spragins interests sought to rescind an executory contract while here the suit is for damages arising from executed contracts.

In October 1980, Huber Treuhand, A.G., and Hans and Josef Huber filed motions to dismiss for lack of in personam jurisdiction or, in the alternative, to quash service of process. Discovery was undertaken and briefs and evidentiary material were filed in support of and opposition to the motions. Defendants maintained that they were not doing business in Mississippi and therefore were not amenable to process here. The affidavits of Hans and Josef Huber which indicated that they had done no "personal" business in Mississippi were contradicted by defendants' answers to requests for admissions wherein these individuals admitted their relationships as directors of Tennessee and Mississippi Huber. As to Huber Treuhand, A.G., Hans Huber, as the Switzerland corporation's president, stated in affidavit that, inter alia, the corporation neither bought nor sold real property located in Mississippi, nor did it employ Kay Taylor to act on its behalf in this state. This affidavit was grossly contradicted by the deposition given by Hans in the Reed litigation, the truth of which was admitted. Accordingly, on August 13, 1981, this court overruled the motions to dismiss, and allowed plaintiffs to attempt to effectuate proper service of process through the use of letters

---

1. On May 3, 1979, Lake Tindall's partner Frank Thackston, Jr., was employed to represent Allen Spragins, Ruth Cranston, and Dr. Philip Cranston. On October 15, 1979, counsel for C. A. Spragins, Sr. and Olivia Spragins was permitted to withdraw, and Thackston thereupon assumed representation of all the Spragins' interests.

rogatory, which were issued from the court on August 19.[2]

The pending petition to disqualify Lake, Tindall was filed on September 11, approximately one month after defendants' counsel requested Lake, Tindall to voluntarily withdraw from representation of the Spragins and Veal interests. Prior to August 5, 1981, neither the defendants nor their counsel had raised the potential conflict of interest issue. As of August 30, 1981, the Lake, Tindall firm had expended a total of 1,119.-50 hours in the representation of the Spragins interests concerning their property disputes with defendants.

## II.

The question of whether a law firm should be disqualified from representing interests adverse to those of a former client "is a matter of ethical, not legal, considerations." *In re Corrugated Container Antitrust Litigation*, 659 F.2d 1341, 1348 (5 Cir. 1981). Our analysis is therefore governed by the Code of Professional Responsibility and controlling precedent interpreting the requirements of that Code.

### (a) *Canon 4.*

Canon 4 requires a lawyer to "preserve the confidences and secrets of a client." The proscription against an attorney revealing confidences of a former client is based on three general policy considerations: fundamental fairness to the former client; the importance of encouraging full and frank communication between attorney and client; and maintenance of the integrity of the bar and judicial system. *Duncan v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 646 F.2d 1020, 1027 (5 Cir. 1981). There is, of course, no per se rule prohibiting a lawyer from representing interests adverse to a former client; rather, "the focus of the district court's inquiry should be on the precise nature of the relationship between the present and former representations." *Id.* at 1029.

A party moving for disqualification has the burden of establishing (1) the existence of an attorney-client privilege between him and the firm he seeks to disqualify, and (2) "that there is a genuine threat that confidences revealed to his former counsel will be divulged to his present adversary." *Id.* at 1028. The latter requirement is presumed to be met so long as the moving party convinces the court that the former representation bears a substantial relationship to the present action. *Id.*

We begin our analysis with a discussion of the former representation. Hunger was retained by Taylor, Hans and Josef for a very limited purpose: to form the Mississippi Huber corporation.[3] This perfunctory service required a total of 18 hours work. Most of Hunger's dealings were with Kay Taylor; time records indicate that Hans and Josef Huber were involved in no more than three conferences with Hunger. These conferences went no further than seeking incorporation of Mississippi Huber, and Hans and Josef so understood the engagement. Hans and Josef did not seek from Hunger legal advice to guide them in their business ventures, nor did Hunger purport to act on their behalf in any other matter. These plain facts serve to emphasize that, while Hans and Josef were, in a limited sense, "clients" of Lake, Tindall, they shared neither a significant nor intimate relationship with the firm as has been found to exist in cases requiring disqualification of an attorney. *See, e.g., In re Corrugated Container, supra*, at 1345 (disquali-

---

**2.** To date, process on these defendants has not been returned. Although the court initially was of the opinion that any ruling on the petition to disqualify would be premature pending service of process, the parties insisted upon prompt resolution of the conflict of interest question, and the court reluctantly acquiesced. Hans and Josef Huber state in the disqualifica-

tion petition that it is filed "without waiving any objections to jurisdiction over them."

**3.** We note that Lake, Tindall never represented Tennessee Huber or Huber Treuhand, A. G., and neither Taylor nor Mississippi Huber are named defendants in the present actions.

fied firm acted as general counsel for corporation for fifty years). In our mind, this sort of limited employment requires a stronger showing that a substantial relationship genuinely exists between the former representation and the present controversy.

■ We are firmly convinced that a substantial relationship does not exist between the issues raised by the present actions and the matters encompassed in Lake, Tindall's former representation of Hans and Josef Huber. The Spragins controversy relates solely to alleged tortious activity by Hans and Josef occurring some months after Hunger's employment was terminated and does not challenge any work Hunger performed for the Hubers. The essence of the present actions, i.e. that Taylor allegedly made false misrepresentations regarding the property transactions between her and the Spragins interests, for which Hans and Josef as well as the other defendants are liable, bears no relationship to Lake, Tindall's prior representation. The only link between the former representation and the present controversy is that in personam jurisdiction over Hans and Josef arises from, *inter alia*, their contacts with Mississippi in their capacities as officers and directors of Mississippi Huber. Viewing the present controversy as a whole, the mere fact that Hans and Josef were known to be officers of Mississippi Huber and to have contacts with this state in that capacity does not bear a substantial relationship to the actions sub judice. Moreover, all the facts concerning the relationships between Hans and Josef and their associated interests were fully developed in court records long before they requested Lake, Tindall to withdraw. Indeed, prior to any discovery being undertaken by plaintiffs, both Hans and Josef admitted in affidavits supporting their motion to dismiss that they had participated in the formation of the Mississippi and Tennessee Huber corporations. We acknowledge that information revealed in an attorney-client relationship is shielded from use by the attorney against his former client "without regard to whether someone else may be privy to it." *See Brennan's, Inc. v. Brennan's Restaurants, Inc.,* 590 F.2d 168, 172 (5 Cir. 1979). Nonetheless, however, a party who voluntarily discloses specific facts in court proceedings should be precluded from protesting use of the same information by his former counsel.

Since no substantial relationship exists between the prior representation and the present actions, the court must determine whether confidences were actually revealed by Hans and Josef in the previous employment. Even disregarding the affidavits of Lake, Tindall's partners, the record independently establishes that no confidences were revealed by the Hubers to Lake, Tindall in the limited employment. As in a similar case in which the Fifth Circuit reversed a district court's order disqualifying former counsel, Lake, Tindall's file on the incorporation of Mississippi Huber, which was introduced at the hearing on the disqualification motion by Hubers' counsel, "involved only bills, corporate papers, and some memoranda, none of which were of a confidential nature." *See Cossette v. Country Style Donuts, Inc.,* 647 F.2d 526, 530 (5 Cir. 1981).

■ Petitioners failing to show either a substantial relationship between Lake, Tindall's former representation of the Hubers, or revelation of confidences in the prior employment, we conclude that Lake, Tindall's representation of the Spragins interests in the case sub judice does not contravene Canon 4 of the Code of Professional Responsibility.

### (b) *Canon 9.*

■ Canon 9 provides that "[a] lawyer should avoid even the appearance of impropriety." To constitute a violation of Canon 9 requiring disqualification, the court must find a specific, identifiable appearance of impropriety and the likelihood of public suspicion must outweigh "the social interest

which will be served by a lawyer's continued participation in a particular case." *Wood v. Covington County Bank*, 537 F.2d 804, 813 n.12 (5 Cir. 1976); *see In re Corrugated, supra*, at 1348. Under the facts of this case, we conclude that there has been no appearance of improper conduct on the part of Lake, Tindall in representing plaintiffs in these actions. Since no issues raised in the present representation encompass matters within the scope of the former association, this is not a case in which attorneys have acted to discredit the legal profession in the public eye. On the contrary, society's interest in allowing Lake, Tindall to continue their representation after expending more than 1000 hours of professional effort on behalf of the Spragins interests far outweighs any possible suspicion which might arise from the firm's prosecution of these actions against Hans and Josef Huber.

### III.

In sum, we find no ground for disqualification of Lake, Tindall. "While lawyers are expected to avoid even the appearance of impropriety, they are not required to sterilize their affairs to avoid baseless charges." *Church of Scientology v. McLean*, 615 F.2d 691, 692 (5 Cir. 1980). The Lake, Tindall firm has acted well within the bounds of ethical conduct, and petitioners have failed to establish just reason for plaintiffs to be deprived of the counsel of their choice. Accordingly, the petition to disqualify Lake, Tindall is hereby denied.